Larry Darnell BRUNSON *v.* STATE of Arkansas

CR 01-1172                                    79 S.W.3d 304

Supreme Court of Arkansas
Opinion delivered June 13, 2002

*Montgomery, Adams & Wyatt, PLLC,* by: *Dale E. Adams,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Clayton K. Hodges,* Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Larry Darnell Brunson was convicted of two counts of first-degree murder and was sentenced to two life terms, to run consecutively. His appeal consists of three allegations of error relating to the testimony of Barbara Ann Neiss: (1) that he was not sufficiently advised that Ms. Neiss would be an expert witness, in violation of Ark. R. Crim. P. 17.1; (2) that Ms. Neiss was not qualified to render an opinion on his proclivity to murder; and (3) that Ms. Neiss's opinion embraced the ultimate issue for the jury to decide and was unduly prejudicial. The trial court qualified Ms. Neiss as an expert on profiling batterers and determining when they are likely to murder victims they have previously abused. In her testimony at trial, Ms. Neiss's profile identified Brunson as one who met eight of ten risk factors for a batterer who will turn murderer. Brunson contends that Ms. Neiss was not qualified to render an opinion on the likelihood that he would murder his wife and her lover and that profiling him was unduly prejudicial. We agree that the trial court abused its discretion in permitting Ms. Neiss to offer her opinion. We reverse the judgment of conviction and remand for further proceedings.

Appellant Larry Brunson and his wife, Gloria Brunson, were married and had two children, Latisha Brunson and Larry Brunson, Jr. The Brunson family lived in Pine Bluff where Gloria Brunson worked for the Social Security Administration from 1979 until her death in 1999. In the late 1990s, Larry and Gloria Brunson became estranged and separated. After the separation, Larry Brunson began harassing his wife. For three years leading up to the shootings in 1999, Gloria Brunson was romantically involved with another man, Frankie Shaw, who was Larry Jr.'s basketball coach.

During the years that Larry and Gloria Brunson were estranged, Larry Brunson called his wife numerous times during the day at her office in the federal building in Pine Bluff and at home. In addition to this behavior, Brunson was physically violent to his wife on a number of occasions. Because of this behavior, Gloria Brunson obtained a permanent protective order against her husband on July 21, 1998. The permanent order was continued on December 29, 1998 and expanded to include her children who sought protection against their father. Despite the protective order, Brunson's harassment of his wife continued.

On multiple occasions, Gloria Brunson filed for divorce from her husband. Her most recent attempt at divorce occurred in November 1998, just before she went to Dallas, Texas, to begin a three-month job-training session. From November 16, 1998, to February 4, 1999, she lived in Dallas. She asked that her co-workers with the Social Security Administration not disclose her whereabouts or any contact information about her. Her co-workers resisted Brunson's repeated requests for the information. Brunson eventually learned where she was and traveled to Dallas where he found her hotel room. He appeared unannounced at the training center, and as a result of his appearance, Gloria Brunson changed her hotel room number and took copies of her protective orders and her husband's photograph to Social Security Administration security personnel.

When Brunson was in Dallas, he stayed with a friend, Dennis Wayne Dilworth, for four days. Dilworth described Brunson at trial as obsessed with his estranged wife. Dilworth also testified that Brunson had a handgun with him during his time in Dallas but that he never heard Brunson make threatening comments about his wife.

In December 1998, Gloria Brunson took a three-week break from her training in Dallas and returned to Pine Bluff for the holiday season. On December 19, 1998, Brunson allegedly planted crack cocaine in his wife's car and then called the Arkansas State Highway Police anonymously. He told them that a white vehicle with a particular license plate number was transporting drugs and possibly a murder weapon. A state trooper pulled Gloria over and

found crack cocaine in a brown paper bag that had been wedged underneath the dashboard of the car. Gloria Brunson was extremely upset and told the trooper that she had been framed by her husband. The trooper believed her story and allowed her to leave without arrest.

At trial, the Brunsons' daughter, Latisha, testified for the State. She described constant phone calls from her father to her mother at their residence. She stated that when her mother would change the telephone number, her father would find a way to get the number by fabricating a story about why he needed it. She also testified that during the spring of 1999, she went to her mother's house and found her father there with a locksmith attempting to gain entry into the house. She also saw him on a number of occasions walking around the perimeter of the house.

She related one incident in 1998 when her father had threatened to commit suicide. She and her mother were at home, and her mother and father had been fighting. He told her that he had a gun and was going to kill himself. He locked himself in a bedroom, and Latisha and her mother heard a gunshot. As it turned out, he had shot a bullet through the window and did not harm himself. Latisha testified that also in 1998, her mother found sugar spread over the engine of her car. She attributed this act of vandalism to her husband. Latisha also testified that during 1998, her father burned some of her mother's clothing, and a neighbor had to call the fire department. Latisha further testified that she heard her father threaten to kill Frankie Shaw.

There were several State witnesses who testified that they had gradually come to understand that Gloria Brunson was romantically involved with Frankie Shaw, although she took steps to prevent this fact from becoming common knowledge. There was testimony that Shaw had visited her in Dallas. Also, Brunson had begun questioning his wife's friends and coworkers about the nature of her relationship with Shaw. According to their testimony, none of Gloria Brunson's friends or coworkers told Brunson that Gloria Brunson and Shaw were romantically linked.

At about 8 a.m. on April 25, 1999, Pine Bluff Police Officer Gregory Shapiro was dispatched to Frankie Shaw's home. When

he arrived, he found two shooting victims on the driveway of his home. Both were deceased. The victims were identified as Gloria Brunson and Frankie Shaw. Officer Shapiro called the homicide unit to the scene. The associate medical examiner, Charles Paul Kokes, testified at trial that Gloria Brunson had been shot in the head four times, with one of the shots having been fired at close range. Shaw had been shot three times in the head, and two of his wounds were apparently sustained as he lay on the ground. There was also a bullet hole in the driver's side of Shaw's car that was consistent with the height of a driver's head. There was blood in Shaw's car. The bodies had apparently been left on the driveway overnight, because they were rainsoaked and rigor mortis had set in. Money had been left in Shaw's wallet, and Shaw's house did not appear to have been entered or ransacked.

A witness for the State, Erica Waddell, testified that Brunson appeared at his parent's house on the night of the murders. She was there visiting her boyfriend, and she saw Brunson enter the house. He changed clothes and then left the house with the bag in which he kept his gun. He returned about an hour later without the bag. He then went to sleep.

Homicide detectives began talking to Gloria Brunson's friends and relatives, and they developed Brunson as a suspect based on those conversations. Before they could locate Brunson, he called the Pine Bluff police station. Police officers next went to his home and requested that he accompany them to the police station. He told the police officers that his .45 caliber pistol, which was consistent with that used as the murder weapon, had been stolen from his car some days earlier. Brunson gave his consent for the police officers to search his home and vehicle, but the murder weapon was never found.

On May 17, 1999, Brunson was arrested and charged with two counts of capital murder for the shooting deaths of Gloria Brunson and Frankie Shaw. The criminal information was later amended to change the charges to two counts of first-degree murder. On April 3, 2000, a three-day trial ensued.

At trial, the State presented the testimony of law enforcement officers as well as Gloria Brunson's friends, co-workers, and chil-

dren. They testified to the events already related, as well as to their individual encounters with Brunson and the fact that Brunson kept a gun and shells in a bag at his residence. One witness, Jennie Green, testified that she saw an encounter between the victims and a black man who appeared to be armed on the day of the killings. The man threatened Gloria Brunson, but Ms. Green could not positively identify Brunson as the man involved.

The State's last witness at trial was the State's proposed expert, Barbara Ann Neiss. She gave her qualifications as having a bachelor's degree in political science and journalism; a master's degree in public administration; work towards a master's degree in social work; one year's employment with the Arkansas Commission on Child Abuse, Rape and Domestic Violence; Executive Director for Advocates for Battered Women, now called Women and Children First, in Little Rock for just under three years; volunteer work for the Battered Women's Shelter and in assisting women to get protective orders for about ten years; work as a facilitator for an educational group for men who batter in Little Rock; work at a Mediation Center to negotiate with women and violent husbands; attendance at national seminars on domestic violence, including the College of District Attorneys; currently serving as a commissioner on the Little Rock Commission on Domestic Violence and a past co-chair; past service on the Board of the Arkansas Coalition Against Domestic Violence; subscriber to literature on domestic violence; local author of papers on domestic violence; witness before committees of the General Assembly for the past two sessions on domestic violence; having testified once in circuit court; and having testified on several occasions in chancery court in support of protective orders, but not as an expert. Over Brunson's objection, the trial court certified Ms. Neiss as an expert. The trial court determined that she was qualified under Ark. R. Evid. 702, because she possessed specialized knowledge that would assist the jury in understanding the evidence in this case. The court further ruled that Ms. Neiss could testify about certain factors that indicate that a batterer will escalate into a murderer. The court stated it did not believe that the prosecutor would elicit from Ms. Neiss her opinion on whether Brunson was likely to kill.

After Ms. Neiss's qualification as an expert, defense counsel again objected on grounds of surprise and a discovery violation. Defense counsel objected to the fact that the prosecution had not been forthcoming about Ms. Neiss's status as an expert or her anticipated testimony, and he moved for a mistrial. The trial court granted Brunson a continuance for one night to give defense counsel an opportunity to interview Ms. Neiss.

The next morning, which was the third day of trial, the trial court reconvened and denied Brunson's motion for a mistrial. The State was allowed to elicit its testimony from Ms. Neiss. Ms. Neiss then testified to ten risk factors that indicate that a domestic batterer may kill. She stated that she had taken the ten factors from the work of a police officer, Anne O'Dell, who surveyed 70,000 cases and assembled what she thought were ten warning signs that a domestic-violence offender would commit murder. The article by Ms. O'Dell was entitled "Assessing Whether Batterers Will Kill." Ms. Neiss used a three-page summary of this article prepared by an attorney, Barbara Hart, and obtained off the internet, in her testimony. Ms. Neiss testified that if more than three of the factors are met, then there is an "incredible duty" to warn a woman of the threat to her safety. The ten risk factors testified to were these:

> (1) threats of homicide against his spouse or children or threats of suicide; (2) fantasies of homicide or suicide; (3) depression; (4) access to weapons; (5) obsessive behavior about his wife or family; (6) centrality of the battered woman to the batterer's life; (7) rage against the battered woman; (8) drug or alcohol consumption; (9) abuse of the battered woman's pet animal; and (10) access to the battered woman.

Ms. Neiss analyzed the Brunsons' relationship and concluded that Larry Brunson met all of the risk factors except drug or alcohol consumption and pet abuse. She concluded her testimony by emphasizing that when even three of the factors are met, there should be serious concerns for a woman's safety.

After the close of the State's case, defense counsel moved for a directed verdict based on insufficient evidence. It was denied, and the defense rested without any presentation of evidence. The

jury returned a guilty verdict on both counts of first-degree murder, and Brunson was sentenced to two terms of life imprisonment.

For his sole point on appeal, Brunson argues that the trial court erred in admitting the testimony of Barbara Ann Neiss as an expert. Brunson advances three theories of error, but it is his second and third points that we conclude constitute reversible error. Under these two points, he contends that the fact the trial court qualified Ms. Neiss as an expert and then allowed her to establish a profile on the predictability that a batterer will become a murderer, using ten risk factors, and that Brunson fell within that profile was an abuse of discretion. We agree.

*a. Qualifications*

Brunson first argues that Ms. Neiss was not qualified to testify as an expert on whether domestic-violence offenders will eventually kill their victims. On the issue of Ms. Neiss's qualifications to so testify, the trial court ruled:

> But first of all, Ms. Neiss testified that she had been working in the area of domestic violence for a protracted period of time. It would appear, to some degree, in excess of 10 years, and it may have been off and on, because she has gone back to school a couple of times. What the Court can recall from her testimony was that she has a bachelor's degree, and the Court does not recall what it was in, but that she has a master's in public administration, is pursuing a master's in the sociological field; that she has had diverse work in several areas of domestic violence, have coordinated programs and is presently coordinating programs in this area. That she has testified in circuit [court] on one occasion, in chancery court upon numerous occasions in the assistance of helping women who were victims of domestic violence.

* * *

> When we look at 702, it would appear to the Court that Ms. Neiss, through her knowledge, experience, training, several seminars and education, should have knowledge that would be beneficial to the jury, and we believe that she has specialized and technical knowledge that should assist the trier of fact to understand the evidence that the State has attempted to put on, and

should help the jury in determining a fact in issue. A fact in issue is whether or not a person with a pattern of domestic abuse, as has been presented by the State, is capable of escalating that to the point of a homicide.

And the Court would find that Ms. Neiss is an expert and should be permitted to testify by giving her opinion on domestic abuse and its escalation.

\* \* \*

Her having not completed her master's in a sociological field and such, I don't think, to be an expert, she would have to have such a master's. I would believe that she could probably gain her work and experience sufficiently from working in the area to be an expert in the field. However, I believe your arguments, from a defense perspective, goes to the weight and the credibility to be given to her testimony rather than whether it should be submitted.

■ ■ Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Sera v. State*, 341 Ark. 415, 17 S.W.3d 61 (2000); *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997); *Mace v. State*, 328 Ark. 536, 944 S.W.2d 830 (1997). Rule 702 of the Arkansas Rules on Evidence entitled "Testimony of Experts" reads: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or other-.wise." We have said that if some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Stout v. State*, 320 Ark. 552, 898 S.W.2d 457 (1995); *Poyner v. State*, 288 Ark. 402, 705 S.W.2d 882 (1986).

The question in this case is whether Ms. Neiss "has knowledge of the subject beyond that of ordinary knowledge." *Stout*, 320 Ark. at 560, 898 S.W.2d at 462. We perceive the real dispute in this case to be over defining what was the subject of Ms. Neiss's testimony. Brunson maintains that Ms. Neiss testified far beyond her realm of expertise about complicated issues of forensic psychi-

atry, because she gleaned from Brunson's behavior as a domestic abuser and stalker certain warning signs that placed him within a profile that predicted he would become homicidal. Stated differently, Brunson complains that Ms. Neiss weighed and forecast his behavior by comparing his case with others and by using ten risk factors to do so. In sum, he contends that she had no experience or background that would enable her to predict when and under what circumstances a stalker like Brunson would become a murderer.

The State responds that Ms. Neiss's testimony was helpful to the jury and, thus, it qualifies as expert testimony. Yet, in doing so the State only addresses one facet of Rule 702 and never squarely addresses the other facet of whether Ms. Neiss was *qualified* by knowledge, skill, experience, training, or education to give an opinion that was helpful to the jury. The problem we see with the State's argument is that testimony may be helpful to a jury but still may be properly excluded if that testimony is offered by a person who is not qualified to render the opinion. The trial court, in its ruling, appears to have similarly conflated the issue of a person's qualifications and the "helpfulness" of the testimony.

This court has held that while a proffered expert's experience might have been beyond that of persons who had no experience at all in the general area to which he would testify, it ·was not error to refuse to qualify him as an expert when his knowledge was below the standards of most recognized experts in the subject field. *Dillon v. State*, 317 Ark. 384, 394, 877 S.W.2d 915, 920 (1994). *See also Stout v. State, supra* (no error where trial court refused to qualify proffered expert on weighing marijuana, where proffered expert had been a drug counselor and his expertise was that he could tell the difference between the various parts of the marijuana plant); *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997) (trial court properly refused to qualify recreational hunter as expert on bullet fragmentation). Other jurisdictions have likewise been circumspect in identifying precisely what is the proffered expert's field of expertise and whether the testimony will fall within that field. *See, e.g., Johnson v. State*, 58 S.W.3d 496 (Mo. 2001) (experience treating sex offenders in prison did not qualify "associate psychologist" to diagnose defendant as one likely

to engage in predatory of acts of sexual violence); *Kirkland v. Commonwealth*, 53 S.W.3d 71 (Ky. 2001) (licensed clinical social worker not qualified to testify defendant could be rehabilitated in an institutional setting); *State v. Willis*, 256 Kan. 837, 888 P.2d 839 (1995) (social worker not qualified to make diagnosis that victim suffered from post-traumatic stress disorder, also known as rape trauma syndrome).

■ We have no doubt that predicting human behavior, and specifically whether a person has a proclivity to murder based on certain risk factors, requires a highly specialized psychological expertise. Ms. Neiss, while a bona fide expert on domestic abuse, exceeded her expertise by profiling batterers who will kill and by conveying to the jury that Brunson fell within that profile. A case in point of Ms. Neiss's testifying far beyond her range of expertise was her conclusion that Brunson suffered from depression—one of the ten risk factors. Ms. Neiss did not possess the necessary psychiatric background to render such a diagnosis. The trial court abused its discretion in qualifying her to so testify.

*b. Profiling*

Because the issue of profiling is likely to recur in the retrial of this matter, we address it. Brunson contends that Ms. Neiss's testimony led the jury irresistibly and ineluctably to a verdict that he had transformed from stalker to murderer. In doing so, he claims that she gave her opinion on the ultimate issue of the case and invaded the province of the jury. Her testimony further violated Rule 403 of the Arkansas Rules of Evidence, he asserts, in that the testimony was more prejudicial than probative. He contends that her testimony should have been excluded. We agree.

■ Rule 704 of the Arkansas Rules of Evidence provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Ark. R. Ev. 704; *Marts v. State*, 332 Ark. 628, 968 S.W.2d 41 (1998). In *Marts*, we said with regard to Rule 704:

> This court has recognized that the trend of authority is not to exclude opinion testimony because it amounts to an opinion on

> the ultimate issue. *See, e.g., Davlin v. State,* 320 Ark. 624, 899 S.W.2d 451 (1995); *Long v. State,* 284 Ark. 21, 680 S.W.2d 686 (1984). Such opinion testimony is admissible provided that it does not mandate a legal conclusion. *Id.* This court has previously drawn the fine distinction between an admissible opinion that "touches upon the ultimate issue" and an opinion, not admissible, that "tells the jury what to do." *Salley v. State,* 303 Ark. 278, 283, 796 S.W.2d 335, 338 (1990) (citing *Gramling v. Jennings,* 274 Ark. 346, 625 S.W.2d 463 (1981)).

*Marts,* 332 Ark. at 642, 968 S.W.2d at 48.

■ The question in this case is whether Ms. Neiss's testimony in effect "mandated a legal conclusion," or, alternatively, whether it was unduly prejudicial. We believe that her profile testimony both mandated a conclusion and was unduly prejudicial. After a description of each one of the ten risk factors Mrs. Neiss borrowed from the article by Ms. O'Dell, the prosecutor elicited an opinion from her regarding whether she thought that Brunson met the factors in this case. For eight of the ten factors, Ms. Neiss answered affirmatively. Then, at the end of her testimony, the following exchange took place:

> PROSECUTOR: And you're saying there were two areas, you say he didn't — no evidence suggests he satisfied? One was the alcohol area; and one was pet abuse; is that correct?
>
> Ms. NEISS: Exactly.
>
> PROSECUTOR: But you said he satisfies at least eight —
>
> Ms. NEISS: Eight.
>
> PROSECUTOR: — out of ten.
>
> Ms. NEISS: Yes.
>
> PROSECUTOR: And you said, after three that you better have serious concerns?
>
> Ms. NEISS: Exactly.

It is true that the prosecutor did not ask Ms. Neiss specifically whether Brunson killed the victims. Nevertheless, her profile about abusers–turned–murderers and Brunson in particular placed Brunson squarely in the murderer category. This is particularly

concerning, since the State's only proof in this case was circumstantial and its theory centered around Brunson's history of domestic abuse and his motive to kill an unfaithful wife and her lover. Ms. Neiss's testimony, in effect, was clear indication to the jury that Brunson was the culprit.

█ With respect to undue prejudice, the type of profiling employed in this case and its prejudicial impact has been called into question in other jurisdictions. A compendium of such decisions was set out recently by the Wyoming Supreme Court in a case where the issue was violence between separated spouses and whether a profile of the defendant was appropriately presented to the jury:

> Many courts find profile evidence irrelevant. *Commonwealth v. Day*, 409 Mass. 719, 569 N.E.2d 397 (1991) aptly articulated the reasoning for such a conclusion:
>
> > A criminal trial is by its very nature an individualized adjudication of a defendant's guilt or legal innocence. Testimony regarding a criminal profile is nothing more than an expert's opinion as to certain characteristics which are common to some or most of the individuals who commit particular crimes. Evidence of a "child battering profile" does not meet the relevancy test, because the mere fact that a defendant fits the profile does not tend to prove that a particular defendant physically abused the victim.
>
> *Id.* at 399. *See also, Percy*, 507 A.2d at 960 (Evidence that other rapists often excused or explained their conduct the way the defendant did was not relevant.); *State v. Clements*, 244 Kan. 411, 770 P.2d 447, 454 (1989) (Evidence which only describes the characteristics of the typical offender has no relevance to whether the defendant committed the crime in question.); *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990) (Proof that a person fits the drug courier profile, unsupported by evidence of drug trafficking, proves nothing.); *State v. Maule*, 35 Wash. App. 287, 667 P.2d 96, 99 (1983) (The relevance of testimony that the majority of child abuse cases involved a male parent figure is not readily discernable.); *State v. Brown*, 370 So. 2d 547, 552 (La. 1979) (Unable to see how evidence of drug courier profile is relevant to any issue of innocence or guilt at the trial on the merits.); *Duley v. State*, 56 Md. App. 275, 467 A.2d 776, 780 (1983)

(Evidence of child abuser profile is totally irrelevant because it does not tend to prove that the defendant committed the acts of abuse attributed to him.); *United States v. Hernandez-Cuartas*, 717 F.2d 552, 555 (11th Cir. 1983), *rehearing denied*, 721 F.2d 822 (11th Cir. 1983) (Drug courier profile evidence is nothing more than the opinion of those officers conducting an investigation, and it cannot be used as substantive evidence of guilt.); *State v. Hansen*, 304 Or. 169, 743 P.2d 157, 161 (1987) (That child abusers use certain techniques to get near their victims has no bearing on whether a person who does these things is a child abuse.); and *People v. Bradley*, 172 Ill. App. 3d 545, 122 Ill. Dec. 523, 526 N.E.2d 916, 921 (1988) (Evidence showing characteristics of child abuser perpetrators was in no way probative or relevant to the question of whether the defendant committed the crime.).

Even assuming that profile testimony is in some degree relevant to the issues at trial, the danger of unfair prejudice to the accused has generally been found to outweigh the probative value. *See Percy*, 507 A.2d at 960-61; *Simpson*, 910 F.2d at 157; *Maule*, 667 P.2d at 99; *Duley*, 467 A.2d at 780; *Brown*, 370 So. 2d at 552; *Day*, 569 N.E.2d at 399; *United States v. Jones*, 913 F.2d 174, 177 (4th Cir. 1990), *cert. denied*, 498 U.S. 1052, 111 S. Ct. 766, 112 L.Ed.2d 785 (1991); and *Bradley*, 122 Ill. Dec. 523, 526 N.E.2d at 921.

*Ryan v. State*, 988 P.2d 46, 55-56 (Wy. 1999) (internal footnotes omitted). The Wyoming Supreme Court also examined whether the expert testimony violated the proscription against character evidence, which is not an issue raised in the instant case. The court concluded that the expert testimony was inadmissible but under the facts of the case was harmless error due to the substantial evidence of guilt otherwise presented at trial.

In a similar vein, our court of appeals has held that the psychological profile of a child sex abuser was inadmissible. *See Hall v. State*, 15 Ark. App. 309, 692 S.W.2d 769 (1985). In *Hall*, the expert presented testimony which in large part consisted of whether the evidence in Hall's case corresponded with the proof presented in the "usual case." Common factors in the usual case, such as whether the perpetrator was known to the victim, where the crime occurred, the age of the perpetrator, the involvement of alcohol, and threatening the child not to tell, were presented by the expert. The court of appeals held that this expert testimony

was distractive and prejudicial, and the court reversed and remanded for a new trial.

We hold that the profiling of batterers likely to become killers and then placing Brunson within that category was unduly prejudicial to his case and, thus, violated Rule 403. Because we reverse on the second and third points, there is no need to address the first point regarding the discovery violation. Harmless error was not an issue raised by the State, but because we do not consider the proof in this case to be overwhelming, we do not affirm for that alternative reason.

Reversed and remanded.