Donald Vern SAUL *v.* STATE of Arkansas

CA CR 04-683 211 S.W.3d 1

Court of Appeals of Arkansas
Opinion delivered June 22, 2005

*Lisa C. Evans*, Chief Deputy Public Defender, for appellant.

*Mike Beebe*, Att'y Gen., by: *Suzanne Antley*, Ass't Att'y Gen., for appellee.

WENDELL L. GRIFFEN, Judge. Donald Vern Saul appeals from his conviction for manufacturing methamphetamine. He argues that the trial court erred in denying his motion for directed verdict. He also contends that the trial court erroneously admitted evidence of a prior conviction for possession of drug paraphernalia and an arrest for shoplifting, that the trial court abused its discretion when it allowed police officers to testify as experts about whether methamphetamine was manufactured, that the trial court abused its discretion when it denied his motion for mistrial or continuance, and that the trial court abused its discretion when it refused to allow an adequate cross-examination of one of the State's witnesses. Because the trial court erroneously admitted proof of appellant's prior bad acts in violation of Ark. R. Evid. 404(b) (2004), we reverse appellant's conviction and remand for a new trial.

### Facts

Appellant was charged with manufacturing methamphetamine after police found what the State alleged to be a methamphetamine lab in appellant's van. Detective Andy Lee of the Bentonville Police Department testified that he was trained at the

DEA Clandestine Lab School in Quantico, Virginia, on identifying the precursors of methamphetamine, identifying hazards, and taking precautions around methamphetamine labs. Detective Lee learned how to cook methamphetamine as part of his training. He described the process in detail to the jury and noted that he would expect to find red phosphorous, iodine crystals, peroxides, rubbing alcohol, Heet, tubing, glassware, funnels, coffee filters, solvents, HCl generators, muriatic acid, and rock or table salt in a lab. These items were common components used in the red-phosphorous method of manufacturing methamphetamine.

Detective Lee testified that he was running stationary radar on Southwest "I" Street on February 13, 2002, when he clocked appellant's van traveling forty-seven miles per hour in a thirty-five mile-per-hour zone. He initiated a traffic stop. During the stop, appellant produced his driver's license, an insurance card, and a certificate of title. Appellant explained that he had recently purchased the van and had not yet registered the vehicle. Detective Lee proceeded to search appellant's van.[1] As he opened the door, he smelled a strong chemical odor, which he identified as a clandestine-lab odor. In the back of the van was a blue plastic storage tub containing what Detective Lee immediately recognized as a methamphetamine lab. Detective Lee identified pictures of the items found in the van and explained their use in the manufacturing process. Introduced into evidence were pictures of discolored glassware, which was a result of burners heating the glass or iodine being put in the glass; coffee filters containing an unknown red sludge and funnels, which were normally used as a filtering system in the manufacturing process; stained, plastic tubing, which appeared to be used to manufacture methamphetamine; duct tape, which was commonly used to construct hydrogen chloride gas generators; two plastic bottles containing a bi-layered liquid substance, a one-gallon jar containing a tri-layered liquid, a Gatorade bottle containing a bi-layered liquid, and a glass jar containing a brown liquid, samples of which were sent to the Crime Lab for testing; match books, which were generally used to produce red phosphorous; a bottle of Red Devil Lye, which was used for the sodium hydroxide needed during the middle part of the cooking stage; two bottles of hydrogen peroxide, which were used to produce crystals; a one-gallon can of camping fuel and a one-gallon can of acetone, which were both

---

[1] The parties stipulated that Detective Lee conducted a lawful search of the van.

used to bring out the methamphetamine from the mixture produced; a stained tube wrapped with electrical tape, which Detective Lee did not know what it was used for but noted that it was probably attached to a vessel at one point; scissors, a knife, razor blades, balloons, and razor blade scrapers, which were used to cut and package methamphetamine; silver hand scales, which were commonly used to weigh the drugs for sale; a soda bottle with red tape wrapped around the top end of it, which would have been used as a HCl generator unless a person were using it to produce crystals; and Wesson oil, which was used to distribute heat and prevent burning of the solution. Detective Lee also identified a picture of a gas can with appellant's name on it. The gas can was found next to the storage bin. Detective Lee stated that, after the items were photographed, a disposal company, Environmental Management, was called to pick up the items.

On cross-examination, Detective Lee testified that he did not see anything consistent with the Nazi method of manufacturing methamphetamine. He later guessed that appellant used the red-phosphorous method. Detective Lee stated that he did not find a heat source. He also did not find any clean coffee filters, used in the "powering out" stage of the process, or any packaging materials or large sums of money. When questioned at the Bentonville Police Department, appellant denied that the items found were his. Detective Lee noted that he only fingerprinted the hazardous waste, that he could not fingerprint everything, and that he found no fingerprints. He also noted that the two bottles of hydrogen peroxide were both full. Detective Lee found no empty hydrogen peroxide bottles; however, he noted that iodine crystals were already present.

Matthew Sarver testified that he worked for the Arkansas State Crime Lab in 2002. While there, he received three months of in-house training and attended the DEA class on methamphetamine labs in Quantico. He noted that there were two ways to manufacture methamphetamine, and he described the processes to the jury. Sarver testified that the red-phosphorous method was used in this case. He identified a mixture of iodine and phosphorous, which he testified was a "reaction sludge" left over after a person cooks methamphetamine; tubing, which he testified was used for the HCl generator; pseudoephedrine; methanol; and a pill soak, which he testified was used early in the manufacturing process. Sarver tested exhibits and found organic solvent and acid. He also testified that the bi-layered liquid found at the scene was

consistent with the final stages in the manufacturing process. He tested a heat-sealed plastic bag containing stained coffee filters and stated that he found the substance to be iodine, one of the three main ingredients. Finally, he identified an HCl generator, bottle of Red Devil Lye, bottles of hydrogen peroxide, and a gallon of acetone, all used in the manufacturing process.

Sarver testified that he did not test every item Detective Lee sent to the Crime Lab and that he tested enough to get a sample from each step of the manufacturing process. He concluded that the items he tested were consistent with manufacturing methamphetamine. He mentioned that something was present from each step of the process and that methamphetamine was present as well. On cross-examination, Sarver testified that no heat source was sent for testing; however, it was possible to manufacture methamphetamine without a heat source. He noted that the manufacturing process took longer and produced a lower yield without a heat source.

Over appellant's objection, Detective Paul Woodruff of the Harrison Police Department testified that he was on duty on November 22, 1998, another occasion on which appellant was stopped. During a consent search of appellant's vehicle, officers found what appeared to be a methamphetamine lab. When Detective Woodruff arrived on the scene, he noted a strong chemical odor coming from appellant. The search of the vehicle yielded components used in the Nazi method of manufacturing methamphetamine. At that time, appellant stated that he was driving along a creek in Boone County when he saw some juveniles manufacturing methamphetamine. Appellant told Detective Woodruff that he knew the items were dangerous and took the items. Detective Woodruff stated that appellant's claim had flaws. First, he noted that there were spills on top of appellant's vehicle, indicating that someone was manufacturing on top of the vehicle. Second, receipts for pseudoephedrine and for lithium batteries were found in the vehicle. Appellant later pled guilty to possession of drug paraphernalia. On cross-examination, Detective Woodruff testified that he did not find any matches or iodine, but that he did not expect to find them because of the method being used in that case. He also noted that he did not find any peroxide or Red Devil Lye and that while police found boxes of Advil in appellant's vehicle, the receipt was for Equate pills.

Over appellant's objection, the jury also heard testimony from Officer Russ Allen of the Rogers Police Department. Officer

Allen testified that he was on duty on December 15, 2000, when he was called to the Wal-Mart Supercenter. When he arrived, he found that appellant had purchased some acetone, two cans of starting fluid, and some bananas. Ten boxes of antihistamine tablets were recovered from appellant's pants. On cross-examination, Officer Allen noted that the incident happened almost three years prior to trial and that he found no iodine, peroxide, tubing, Heet, batteries, or matches on appellant. He also found no drugs. After Officer Allen testified, the State rested its case.

Appellant testified that he lived in Harrison. He stated that he had never seen the blue plastic storage bin found by Detective Lee and denied using methamphetamine the day of his arrest. Appellant testified that he planned to go to dinner with his ex-wife and children. He stated that he drove to a job site in Highfill in his van that day. Appellant also stated that he submitted to a drug test when he arrived at the Benton County Jail and that he tested negative. On cross-examination, appellant stated that his tools were in the van and that the gas can should have had his name on it. He did not smell anything in the back of his van, and he denied that he normally carried chemicals in the back of his van. He acknowledged that he pled guilty to possession of drug paraphernalia in 1999. He repeated the statement that he gave to Detective Woodruff but testified that he pled guilty because he had a syringe on him. Appellant also claimed that he was arrested every time he was pulled over. For example, he testified that he was arrested on April 23, 2003, because he had bought Coleman fuel.

Kimberly Cunningham testified that she was a part owner of K.C. Construction, appellant's employer. She testified that appellant arrived at work at 8:00 a.m. on February 13, 2002, and left that day at approximately 5:30 p.m. She noted that appellant drove a van and that she never saw a storage bin inside the van. On cross-examination, Cunningham stated that she was aware of appellant's criminal history, that appellant was an excellent employee, and that she did not mind having convicted felons working for her.[2]

Appellant called Jeff Bland, a parole officer supervising appellant, who testified that he tested appellant the day he was

---

[2] Appellant proffered the testimony of Howard Cunningham, who was unavailable to testify that day. Cunningham would have testified that appellant was at the work site that day and that he never saw a blue storage bin in appellant's van.

arrested and that he tested negative. Appellant also called Colleen Gray, appellant's ex-wife, who testified that she planned to have dinner with appellant that day but that appellant never arrived at her house. After Gray's testimony, appellant rested his case.

The jury found appellant guilty of manufacturing methamphetamine. He was later sentenced to thirty years in the Arkansas Department of Correction. This appeal followed.

Appellant argues that the trial court erred in denying his motion for directed verdict. Because of double-jeopardy concerns, we consider challenges to the sufficiency of the evidence before addressing other arguments. *See Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). A motion for directed verdict is a challenge to the sufficiency of the evidence. *Whisenant v. State*, 85 Ark. App. 111, 146 S.W.3d 359 (2004). On appeal from a denial of a motion for directed verdict, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* In determining whether there is substantial evidence to support the verdict, we review the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* The fact that evidence is circumstantial does not render it insubstantial; however, when circumstantial evidence is relied upon, it must exclude every other reasonable hypothesis other than the guilt of the accused. *Id.* The question of whether circumstantial evidence excludes other reasonable hypotheses is for the fact finder to determine. *Id.* In reviewing the sufficiency of the evidence, we consider evidence both properly and improperly admitted. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998).

### Sufficiency of the Evidence

Appellant argues that the State presented insufficient evidence to prove that he manufactured methamphetamine. Arkansas Code Annotated section 5-64-401(a) (Supp. 2003) states that it is unlawful for a person to manufacture a controlled substance. "Manufacture" is defined as:

> the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or inde-

pendently by means of chemical synthesis, and include any packaging or repackaging of the substance or labeling or relabeling of its container[.]

Ark. Code Ann. § 5-64-101(m) (Repl. 1997).

██ Appellant contends that he could not be convicted of manufacturing methamphetamine because there were deficiencies in the manufacturing process. He states that the police never found a heating element, a "critical element" in the process. However, the jury heard testimony that a heating element is not necessary to manufacture methamphetamine. Appellant attempts to discredit Sarver's testimony by stating that he was a chemist and not an expert in the detection of methamphetamine labs; however, such a fact would go to Sarver's credibility, not to the sufficiency of the evidence. It is in the province of the fact-finder to determine the weight of the evidence and the credibility of witnesses. *Johnson v. State*, 337 Ark. 196, 987 S.W.2d 694 (1999); *Stewart v. State*, 89 Ark. App. 86, 200 S.W.3d 465 (2004). As such, the jury was free to accept or reject Sarver's assertion, and we cannot re-weigh the credibility of the evidence on appellate review. Appellant also notes that the police did not find any used bottles of hydrogen peroxide, no used striker plates, no baggies for packaging the finished product, or clean coffee filters to filter the finished product. However, we have affirmed convictions for manufacturing methamphetamine when less than all of the necessary components were present. *See, e.g., Cherry v. State*, 80 Ark. App. 222, 95 S.W.3d 5 (2003) (affirming a conviction when no lithium, a necessary component in the method used by the appellant in that case, was found at the appellant's residence); *Smith v. State*, 68 Ark. App. 106, 3 S.W.3d 712 (1999) (affirming a conviction when appellant's home contained all but one of the necessary components and appellant had expected the arrival of the missing ingredient and had begun the cooking process). Appellant's van contained components of various stages of the manufacturing process. In addition, Detective Lee testified that appellant's van had a chemical odor consistent with manufacturing methamphetamine. Appellant also notes that the police found no finished product in the search of his van. However, many of the components found in appellant's van contained methamphetamine residue. The drug does not have to be in its final form before one can be convicted of

manufacturing methamphetamine. *See Lee v. State*, 297 Ark. 421, 762 S.W.2d 790 (1989) (affirming a conviction for manufacturing when there was ample evidence that processing and preparation of the drug took place).

██ ██ Finally, appellant argues that there was insufficient evidence to prove that the items found in the van belonged to him. The State presented sufficient evidence to prove that appellant constructively possessed the items in the storage bin. When seeking to prove constructive possession, the State must establish that the defendant exercised care, control, and management over the contraband. *George v. State*, 356 Ark. 345, 151 S.W.3d 770 (2004). This control can be inferred from the circumstances, such as the proximity of the contraband to the accused, the fact that it is in plain view, and the ownership of the property where the contraband is found. *Id.* In this case, the items were found in appellant's van, along with a gas can with appellant's name on it, which appellant admitted was his. While appellant presented witnesses who testified that they saw nothing in his van all day, the jury was free to reject their testimony. *See Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). The State presented sufficient evidence to prove that appellant manufactured methamphetamine. The trial court did not err in denying appellant's motion for directed verdict.

## *Prior Bad Acts*

██ Appellant argues that the trial court abused its discretion when it allowed the State to introduce evidence of his prior conviction for possession of drug paraphernalia and his prior arrest for shoplifting antihistamine tablets. Specifically, he contends that both prior bad acts were inadmissible under Ark. R. Evid. 404(b). We agree. Rule 404(b) of the Arkansas Rules of Evidence states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The admission or rejection of evidence under Rule 404(b) is left to the sound discretion of the trial court, and we will not reverse absent

a showing of manifest abuse. *Holt v. State*, 85 Ark. App. 308, 151 S.W.3d 1 (2004). Evidence offered pursuant to Rule 404(b) must be independently relevant. *Id*. Evidence is independently relevant if it tends to prove a material point and is not introduced solely to prove that the defendant is a bad person. *Id*. However, even if independently relevant, evidence of other crimes may still be excluded under Rule 403 if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *Id*.

Appellant argues that neither act was independently relevant to a material issue in the case against him and that the probative value of the evidence of the prior bad acts was substantially outweighed by the danger of unfair prejudice. In *Holt v. State, supra*, we reversed a conviction for possession of methamphetamine with intent to deliver when the trial court allowed evidence that the appellant was arrested for possessing syringes, one of which tested positive for marijuana, one year prior to the arrest for which he was being tried. In that opinion, we cited several other opinions where the trial court erred in admitting prior bad acts. *See id*. (citing *Evans v. State*, 287 Ark. 136, 697 S.W.2d 879 (1985) (superceded by statute on a separate issue) (reversing and remanding where it could not be said that merely because two burglaries occurred on the same night and involved items of similar nature, the State should be allowed to reference the other burglary); *Rios v. State*, 262 Ark. 407, 557 S.W.2d 198 (1977) (reversing and remanding when the trial court admitted evidence of other drug deliveries to prove that the appellant made a drug delivery on the date in question); *Sweatt v. State*, 251 Ark. 650, 473 S.W.2d 913 (1971) (reversing a conviction for selling LSD when the trial court allowed testimony showing that the appellant previously sold marijuana from his apartment)).

 While the State argues that the prior bad acts were admissible to establish "motive, intent, plan, knowledge, and the absence of mistake or accident," it appears that the bad acts were introduced for no reason other than to show that appellant shows a propensity toward manufacturing methamphetamine. The only issues in this case were whether the materials found in appellant's van could be used to manufacture methamphetamine and whether those materials belonged to appellant. Appellant's prior possession conviction and shoplifting arrest were not relevant to either of these issues other than to show that appellant had been involved to

some extent in the manufacture of methamphetamine in the past.[3] This is "the very type [of evidence] that Rule 404(b) was designed to prohibit." *Hamm v. State*, 91 Ark. App. 177, 184-85, 209 S.W.3d 414, 419 (2005).

 Furthermore, we do not consider the error in this case harmless. Where evidence of guilt is overwhelming and the error slight, this court can declare the error harmless and affirm. *Proctor v. State*, 349 Ark. 648, 79 S.W.3d 370 (2002). The State called witnesses for the sole purpose of establishing these prior bad acts and discussed them in both its opening statement and closing argument. When excised from the case, the only evidence remaining is the fact that the methamphetamine lab was found in appellant's vehicle. Because the trial court erroneously admitted evidence of prior bad acts and because that error was not harmless, we reverse appellant's conviction and remand this case for a new trial.

### Testimony About the Manufacturing Process

 As it is the only other issue likely to come up on remand, the only other issue we address is appellant's contention that the trial court abused its discretion when it allowed Detective Lee to testify as an expert and offer opinions about whether methamphetamine was manufactured. Appellant contends that Detective Lee's testimony was highly prejudicial and completely unnecessary for the jury to understand the case. Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Jackson v. State*, 359 Ark. 297, 197 S.W.3d 468 (2004) (quoting *Brunson v. State*, 349 Ark. 300, 79 S.W.3d 304 (2002)). Rule 702 of the Arkansas Rules of Evidence (2004) provides:

---

[3] At trial, the State relied on *Owens v. State*, 325 Ark. 110, 926 S.W.2d 650 (1996), and *Neal v. State*, 320 Ark. 489, 898 S.W.2d 440 (1995). In both cases, the State admitted testimony of prior bad acts in light of arguments that the appellant was unaware that the contraband was in their home. In both cases, however, the recent drug activity tended to discredit assertions that the appellants had no knowledge of the presence of drugs in their homes. In the present case, however, we are unable to see how a four-year-old prior conviction for possession of drug paraphernalia and a two-year-old shoplifting arrest tend to show that appellant was manufacturing methamphetamine in 2002.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

When determining whether to allow expert testimony to be admitted, the trial court must initially determine whether the witness is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Farm Bureau Mut. Ins. Co. of Arkansas v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000). If some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Jackson v. State, supra* (quoting *Brunson v. State, supra*). The trend is not to exclude expert opinion testimony that amounts to an opinion on the ultimate issue as long as such testimony "does not mandate a legal conclusion." *Brunson*, 349 Ark. at 312, 79 S.W.3d at 311 (citing *Davlin v. State*, 320 Ark. 624, 899 S.W.2d 451 (1995); *Long v. State*, 284 Ark. 21, 680 S.W.2d 686 (1984)).

Arkansas appellate courts have allowed police officers to testify regarding their experiences in drug cases. *See Marts v. State*, 332 Ark. 628, 968 S.W.2d 41 (1998) (allowing testimony from two officers concerning how methamphetamine was packaged and sold was proper in light of the State's burden to prove that the appellant had possessed methamphetamine with the intent to deliver it); *Hicks v. State*, 327 Ark. 652, 941 S.W.2d 387 (1997) (holding that the trial court did not abuse its discretion when it allowed a police officer who was not qualified as an expert witness to testify on redirect examination about variations in drug purity levels within certain quantity of methamphetamine, as such testimony constituted, in the officer's experience, very commonsense explanations for batch of methamphetamine not being mixed thoroughly); *Heritage v. State*, 326 Ark. 839, 936 S.W.2d 499 (1996) (affirming a conviction for possession of methamphetamine with intent to deliver when a police officer was allowed to testify as to normal drug purity level found on streets and as to market value of drugs involved). While appellant claimed that Detective Lee's testimony was unnecessary, appellant argued at trial that the materials in the van could not be used to manufacture metham-

phetamine.[4] Because appellant disputed whether or not the items could have been used to manufacture methamphetamine, the process was relevant in this trial. The trial court did not err in allowing Detective Lee to testify about the manufacturing process.

Reversed and remanded.

GLOVER and ROAF, JJ., agree.

---

[4] Appellant said in his opening statement:

Now, there may or may not have been items necessary for making methamphetamine. That's for you to decide. The State will need to present facts to you to prove to you beyond a reasonable doubt that those items were there, that the necessary items were there to manufacture methamphetamine, all of the necessary items.

He also stated in his closing argument:

When we take a closer look inside this container, you can see the things that the State alleges that you need for a methamphetamine lab, and we can see that there are some pretty important things missing out of this container. These are things that Officer Lee tells you are vital to the manufacturing process, things that were not present. The biggest thing that is not present in the situation is the heat source. This is the hot method, the red phosphorous method of cooking methamphetamine. Both Detective Lee and the Crime Lab guy explained to you that this is the hot method. There should be a heat source. There should be a hot plate.

\* \* \*

Officer Lee told you in his testimony that more than one stage required a heating process. There was nothing like that that was found in the blue container, and it's a critical component if they are going to have a meth lab. There is no evidence that one was found anywhere the day that Mr. Saul was arrested. And according to Officer Lee this is a lengthy process. It's not something you do in a matter of minutes. Vern Saul was only at his place less than an hour. He was pulled over at 6:30. He got off work at 5:30. That's a short amount of time, and there's no heat source found.

There are no pills. There are no clean filters available to filter the finished product. He told us that that was the ending stage, that the product had to be filtered to finish off the process. The absence of those filters indicates that the plan was not to finish off the process. There are no bags to put a finished product in. There is no white powder found in the van. There is not a finished product