

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-16-266

| | | |
|---|---|---|
| RASHUNE RAGLON | APPELLANT | **Opinion Delivered:** May 3, 2017 |
| V. | | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CR-14-27] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE BERLIN C. JONES, JUDGE |
| | | AFFIRMED |

## RITA W. GRUBER, Chief Judge

Rashune Raglon was found guilty by a jury in the Circuit Court of Jefferson County of second-degree murder and was sentenced as a habitual offender to 65 years' imprisonment in the Arkansas Department of Correction. The victim, Demetric McDaniel, died of a shotgun wound to the head. There was evidence at trial that on the night of the shooting, Raglon had been smoking the synthetic cannabinoid K2. He admitted shooting McDaniel in the head but claimed that the gun accidentally discharged. Dr. Frank Peretti, who was qualified at trial as an expert in the area of forensic pathology, testified over Raglon's objection about how people behave after using K2. Raglon raises one point on appeal, contending that the circuit court abused its discretion when it permitted the expert to testify beyond the limits of his qualifications and that the testimony was unduly prejudicial. We affirm.

Generally, the admissibility of expert testimony depends on whether the testimony

SLIP OPINION

will aid the fact-finder in comprehending the evidence presented or resolving a fact in dispute. *Wood v. State*, 75 Ark. App. 22, 26, 53 S.W.3d 56, 59 (2001). Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision; it requires that the circuit court acted improvidently, thoughtlessly, or without due consideration. *Hajek-McClure v. State*, 2014 Ark. App. 690, at 9, 450 S.W.3d 259, 265. We will not reverse a ruling on the admission of evidence absent a showing of prejudice. *Id.*

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ark. R. Evid. 702 (2016). When expert scientific testimony is proffered,

> the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue.

*Wood*, 75 Ark. App. at 27, 53 S.W.3d at 59–60 (citing *Farm Bureau Mut. Ins. Co. of Ark. v. Foote*, 341 Ark. 105, 116, 14 S.W.3d 512, 519 (2000) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993) (footnotes omitted)). *See* Ark. R. Evid. 104(a).

Testimony, even if helpful to a jury, may be properly excluded if it is offered by a person not qualified to render the opinion. *Brunson v. State*, 349 Ark. 300, 310, 79 S.W.3d 304, 310 (2002). Unless the person is clearly lacking in training and experience, the decided tendency is to permit the fact-finder to hear the testimony of someone having superior

SLIP OPINION

knowledge in a given field. *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 372, 268 S.W.3d 905, 914 (2007). The fact that a medical expert is not a specialist in that particular field does not necessarily exclude him or her from offering testimony. *Dundee v. Horton*, 2015 Ark. App. 690, at 6–7, 477 S.W.3d 558, 562. Nor is absolute expertise concerning a particular subject required to qualify a witness as an expert. *Id.* Rule of Evidence 702 expressly recognizes that an expert's testimony may be based on experience in addition to knowledge and training. *Id.*

Here, the State presented testimony that after midnight on November 28, 2013, Kevin Kirk of the Pine Bluff Police Department went with officers to apartments at 26th and Beech Streets on a welfare check concerning a young child. They entered an open door to an apartment where they heard the noise of a television. They saw a man's body in a coagulated pool of blood; a shotgun with a sawed-off handle was beside him, and there was "brain matter on a mattress that he was semi-on." Coroner Chad Kelly pronounced the victim dead—the apparent cause of death being a gunshot wound to the left side of the head.

Brandon McClatchie testified that in November 2013 he was living in the Beech Street apartments while on the run from drug court and was involved with K2. On the night of the shooting, he "fronted" McDaniel and Raglon some K2 and allowed them to sell it out of the apartment. Early the next day, McClatchie returned from shopping and dining in Little Rock. McDaniel gave money to McClatchie, who gave McDaniel more K2. McClatchie gave Raglon another gram of K2 because he had smoked his or given it away, had spent his money on PCP, and had kept saying that a gram was missing. The three of them sat on an

3

air mattress and began playing an Xbox game; McClatchie was in the middle, with McDaniel a foot and a half to his right and Raglon the same distance to the left.

McClatchie further testified that Raglon and McDaniel had brought guns to the apartment for protection from robbery, something that "goes along with the business of selling drugs."[1]  McDaniel's long-barreled shotgun was on the floor to his right; Raglon's green-and-black sawed-off shotgun was on the floor in front of him.  Just before the shooting, McClatchie and McDaniel had been playing a game, and Raglon had been sitting on the floor—leaning on the mattress.  According to McClatchie,

> There were no arguments, nothing . . . and then a sudden flash and a bang, boom, across my face.  I could feel, like, the wind off it.  . . . Raglon  shot my best friend. I saw the gun. He pointed it at me after he shot him.  He did not say anything at first. I went in my pocket. I thought he was wanting to rob me.  He meant business.  I went into my pocket like, "what you want, what you want."  He was like "come on, come on."  He grabbed my shirt.

McClatchie testified that Raglon then rushed him out the door, repeating "come on, come on" and leaving the door open.  McClatchie further testified,

> I did not recognize the person I was looking at.  It was his eyes, he did not look like [himself]. I have not been around while he was on PCP—I do not allow it around me. I am familiar with what happens to a person on that drug.  They do stupid things they probably do not even remember doing.  A lot of killing has been going on about that drug.

Jeremy Shephard was going up the stairs as Raglon and McClatchie were leaving the apartment.  Raglon directed the two of them into Shephard's car and said to take him to the river port.  Shepard was driving, another man was sleeping in the front seat, and Raglon and

---

[1]On cross-examination, McClatchie testified that McDaniel had brought the shotguns.

McClatchie were in the back. When Shephard went the wrong way, Raglon got mad. He was "agitated and had this loaded shot gun." McClatchie, to protect himself, suggested that Raglon remove the bullets and throw the gun somewhere. Raglon unloaded the gun, threw the shells out the window on the way to the port, and threw the gun over the rail from the middle of a bridge. He threatened McClatchie and Shephard that he would "come back and kill [them]" if they said anything, that he "had done it before," and that he had not trusted McDaniel. During his testimony, McClatchie identified a photograph of a green–and–black shotgun as the one that Raglon had thrown over the bridge railing.[2]

Dr. Peretti, testifying as an expert in the area of forensic pathology, explained that his job at the crime lab as associate medical examiner included performing autopsies and issuing death certificates. He testified that he had performed the autopsy in this case. He opined that the cause of death was a shotgun wound and that, based on the wound, the gun barrel was less than one inch from McDaniel's head. Dr. Peretti said that he had performed some 350 autopsies in the past 25 years and had "some opinion about the effects of certain drugs on the body." He explained:

> I drug tested Mr. McDaniel at the crime lab. I was not able to identify any drugs. We test for the drugs of abuse, the major categories, which includes amphetamines. It also includes methamphetamine, barbiturates, the benzodiazepines, cannabis, marijuana, cocaine, opiates—which includes phencyclidine or PCP. Mr. McDaniel did not have those drugs in his system.
>
> We do not test for K2. I am familiar with K2. It is a synthetic cannaboid, or

---

[2]Another trial witness identified the same photograph as showing the shotgun that he and his son had found lying in a ditch at a bridge near the river port the day after the shooting.

marijuana. PCP is a hallucinogenic drug. K2 is legal in most states and you can buy it over the counter at some stores. I have seen the effects of K2 on people the last several years. The people using the drug become psychotic. They go into rages. I have seen people jump off bridges and through plate glass windows. It is a really bad drug.

At this point in the testimony, Raglon objected that the witness was not an expert on narcotic drugs and their effects and was not qualified to talk about the effects of K2 and PCP. The circuit court stated that it would withhold ruling on the objection and allow the witness to lay a foundation. Dr. Peretti then testified:

> I do not have any training in the sense that I am a toxicologist or pharmacologist. When I am answering these questions, it is what I have seen over the years in different cases. I certify deaths due to these drugs. I have knowledge of them, but I do not treat people with them. I have never treated anyone in my life. I just have knowledge to evaluate findings and causes of death in relation to these drugs for which I issue death certificates. I make determinations that people died from an overdose every day. I also review toxicology reports and decide about how the person, what activity he was involved with at his death based off the drugs that were in his system. I do it every day. With the information I have I can conclude how these drugs [affect] people based off the historical information obtained from the coroner, families, and investigating agencies.

Raglon again objected. He argued that Dr. Peretti was generally testifying about other cases, such as those in which he had talked to family members, and that the testimony was not related to the present case. The prosecution responded that the testimony was about K2, that Raglon had been using K2, and that the prosecution has asked whether Dr. Peretti had a professional opinion based on how people react to K2. The court ruled:

> Testing for K2 is totally separate from knowing how it works, operates, or impacts the body. He would not have to test for it to know it. Those general questions are not related to the Defendant, Mr. Raglon, in terms of how it would make Mr. Raglon act. The question was "How do people who have ingested K2 respond?" You objected to him going in depth with that line of questioning. The prosecutor went back to lay a foundation. He stated that he was not a pharmacologist

or a toxicologist but that he does have to determine death due to these products. Some kind of way, he has got to know something about what he is doing to know a person died from an overdose of drugs.

I do not know what he would do if the overdose was from K2, since they do not test for that. That is only dealing with the person's death. Whatever he has gotten in terms of training, experience, or whatever in terms of how it impacts somebody, that is what he is asking. He did as [sic] how it impacted Mr. Raglon. Whether, Mr. Raglon was on it, because he has not had any contact with Mr. Raglon, he has only had contact with the decedent and we are not talking about how the decedent acted.

Based on the question that was asked and the experience the doctor has, I am going to allow him to answer the question.

Dr. Peretti then testified that he knows how a person generally reacts to K2. He said it is a very dangerous drug because people can act psychotically. He explained that a reaction can be immediate or sometimes delayed, such as for a week.

Jeremy Shephard testified that on November 28 in the early morning, he drove to the apartments to buy K2 from Brandon McClatchie. He corroborated McClatchie's testimony that Raglon had a shotgun when he came out of the apartment holding McClatchie "by the shirt"; that Shephard and McClatchie followed Raglon's directive to get in the car; that Shephard drove to the port; and that Raglon threw the gun off the bridge.

Raglon testified in his own defense. He explained that he has a medical condition affecting his right foot and leg as a result of being shot years earlier. He testified that he was really high the night of the shooting because he had been drinking beer, had taken Xanax, and had been smoking K2 with McDaniel and McClatchie. He said that McClatchie was in the bathroom, nowhere in sight, when the shooting occurred. Raglon said that he was sitting down watching the door when he saw someone coming. Raglon explained that, because of

7

his leg and paralyzed foot, he could not get up from the ground without something to help him; he pushed off the wall and stumbled with the gun; and the gun went off. He testified that he gave McClatchie the gun while they were in the car, McClatchie took the bullets out, and Raglon threw them out the window. He denied throwing the gun out of the car, saying instead that he left it with McClatchie and told him to get rid of it, and denied threatening to kill McClatchie unless he kept quiet. Raglon testified that the gun was already in the apartment when he arrived and said that it was not the one identified by trial witnesses. He said that he left to stay with a relative in Kansas City shortly after the shooting and that, rather than explaining to her his reason for being there, told her that a Pine Bluff drug dealer was trying to kill him.

On appeal, Raglon argues that no evidence indicated that Dr. Peretti was testifying from his expert, scientific knowledge about how people react to K2. He argues that Dr. Peretti's opinion had no scientific basis in knowledge, skill, training, or experience. He concludes that the circuit court abused its discretion when it allowed the testimony that K2 could cause a person to become psychotic or go into a rage and that the onset could be sudden or delayed. He argues that prejudice resulted because this testimony rendered an opinion that negated manslaughter and negligence, on which the jury had received lesser-included instructions.

We agree with the State that Dr. Peretti's testimony did not range too far outside his area of expertise and that he demonstrated knowledge beyond that of ordinary knowledge regarding the effects of K2 on a user. *See, e.g.*, *Dundee v. Horton*, 2015 Ark. App. 690, at 6,

477 S.W.3d at 562. Thus, he was properly allowed to testify as an expert regarding the effects of K2 on someone who ingests it. We hold that the circuit court did not abuse its discretion by allowing him to do so.

Finally, Raglon asserts that Dr. Peretti's testimony created a profile of K2 users who go into psychotic rages without warning—with the effect either sudden or delayed—and that trial testimony placing Raglon into the profile "foreclosed his defense as to the lesser included offenses of manslaughter and negligent homicide." We note that there was other strong evidence to dissuade the jury from delivering a verdict on lesser-included offenses of manslaughter or negligent homicide.

Affirmed.

GLADWIN and VAUGHT, JJ., agree.

*The Lancaster Law Firm, PLLC*, by: *Clinton W. Lancaster*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.