FARM BUREAU MUTUAL INSURANCE COMPANY
of Arkansas, Inc., and Southern
Farm Bureau Casualty Insurance Company *v.*
Gaylon FOOTE and Tammy Foote

99-1365 14 S.W.3d 512

Supreme Court of Arkansas
Opinion delivered April 20, 2000

*James Robert Marschewski*, Judge;

*Hardin, Jesson & Terry*, by: *Rex M. Terry, J. Rodney Mills*, and *Kirkman T. Dougherty*, for appellants.

*Nolan, Caddell & Reynolds*, by: *Bennett S. Nolan*, for appellees.

DONALD L. CORBIN, Justice. This appeal raises issues of first impression regarding (1) alleged premature jury deliberations, and (2) the applicability of *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to the Arkansas Rules of Evidence. Appellants Farm Bureau Mutual Insurance Company of Arkansas, Inc., and Southern Farm Bureau Casualty Insurance Company (collectively, "Farm Bureau") appeal the judgment of the Sebastian County Circuit Court in favor of Appellees Gaylon and Tammy Foote for their claim to recover insurance proceeds, after a fire destroyed their residence. Farm Bureau raises seven points for reversal. Our jurisdiction of this matter is pursuant to Ark. Sup. Ct. R. 1-2(b)(1). We affirm.

The record reflects that in the early morning hours of September 29, 1997, while the Footes were out of town, their residence in Greenwood was destroyed by fire. Their Chevrolet Blazer and two Polaris watercrafts, which were parked in the garage at the time, were also destroyed. It was not disputed that the homeowners policy and the motor-vehicle policy issued by Farm Bureau were in effect at the time of the fire. It was not disputed that the Footes were the named insureds, and that the fire resulted in a total loss. Farm Bureau paid off the mortgage interest in the home held by Farmers Bank, as well as the lien on the Blazer held by First Resource Credit Union. Farm Bureau denied payment to the Footes, however, because its investigation revealed that (1) the fire was intentionally set by the Footes or at their direction, and (2) the Footes intentionally concealed or misrepresented material facts or circumstances relating to their loss and coverage.

The Footes subsequently filed suit against Farm Bureau in the Sebastian County Circuit Court. The jury returned a verdict in favor of the Footes, finding that (1) the Footes had an insurable interest in the residence; (2) the Footes had not committed fraudulent acts or made material false statements in their procurement of the policies or in the damage claims; and (3) the fire was not intentionally set by the Footes or by anyone else at their direction. Following the jury's verdict, the trial court awarded the Footes

$117,297.62, plus interest; a statutory penalty of $14,075.71; costs of $323.63; and attorney's fees of $47,574.45. This appeal followed.

## I. Substantial Evidence

■ For its first point for reversal, Farm Bureau argues that the trial court erred in denying its motion for directed verdict. Farm Bureau also argues for its sixth point that the jury's verdict is not based on substantial evidence. Because these points are merely different ways of stating the same argument, we review them together. Specifically, Farm Bureau argues that (1) the Footes failed to establish an insurable interest in the property; (2) the homeowners policy was voided by the Footes' fraudulent acts and false statements made before and after the fire; and (3) the fire was intentionally set by the Footes. When reviewing a denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *State Auto Property & Cas. Ins. v. Swaim*, 338 Ark. 49, 991 S.W.2d 555 (1999). Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond mere suspicion or conjecture. *Id.* We review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

### A. Insurable Interest

Farm Bureau argues that there was not substantial evidence showing that the Footes had an insurable interest in the property. This argument is based on the claim that the Footes lacked ownership because their names were not on the title to the home.

According to the evidence, the Footes had lived at the residence in Greenwood for several years prior to the fire and had made improvements to the home by constructing a garage and a two-story addition. The Footes admitted that title to the property was in the names of Gaylon's parents, Garlan and Judy Foote. Both Gaylon and Tammy testified that at the time the home was purchased, they were divorced, but attempting to reconcile. They indicated that because they were not certain of a reconciliation, title to the home was put in Gaylon's parents' names. They also admitted that the mortgage was in Gaylon's parents' names, and that payments were

made out of a joint bank account shared by Gaylon and his mother. Nevertheless, the Footes maintained that they actually paid all the mortgage payments, insurance, and taxes on the home, and that they also paid for the improvements to the property.

Garlan Foote confirmed their testimony regarding the ownership and payment of the home. He stated that when Tammy and Gaylon split up, Gaylon thought it would be best to put the house in his parents' names in case there was any confusion later. He stated that Gaylon has paid for the house, and that Gaylon and Tammy paid for the improvements to the home. He stated that he and his wife have never made any mortgage payments or exercised any control over the house. He stated further that although his wife actually writes out the payment checks, she has no interest in the joint bank account.

 Arkansas Code Annotated § 23-79-104 (Repl. 1999) provides:

> (a) No contract of insurance of property or of any interest in property or arising from property shall be enforceable as to the insurance except for the benefit of persons having an insurable interest in the things insured at the time of the effectuation of the insurance and at the time of the loss.

> (b) "Insurable interest" as used in this section means any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment.

"[A]n insurable interest is not dependent upon ownership." *Beatty v. USAA Cas. Ins. Co.*, 330 Ark. 354, 361, 954 S.W.2d 250, 253 (1997) (quoting *Hinkle v. Perry*, 296 Ark. 114, 119, 752 S.W.2d 267, 269 (1988)).

> Generally speaking, a person has an insurable interest in property whenever he would profit by or gain some advantage by its continued existence and suffer some loss or disadvantage by its destruction. If he would sustain such loss, it is immaterial whether he has, or has not, any title in, or lien upon, or possession of, the property itself.

*Id.* at 361-62, 954 S.W.2d at 253-54 (quoting *Hartford Fire Ins. Co. v. Stanley*, 7 Ark. App. 94, 96, 644 S.W.2d 628, 629 (1983) (citing, 3 *Couch on Insurance* § 24:13 (2d ed. 1960))). The foregoing testimony

is substantial evidence that the Footes had a substantial economic interest in preserving the property and stood to suffer some loss or disadvantage by its destruction. Accordingly, the Footes had an insurable interest in the residence and the property therein, regardless of the fact that they were not the titled owners of the residence.

### B. Fraudulent Acts and False Statements

Farm Bureau next argues that the Footes were not entitled to any recovery under the terms of the homeowners policy, due to the allegedly uncontroverted evidence that the Footes committed fraudulent acts and made false statements. Specifically, Farm Bureau contends that the Footes made false statements about (1) their status as owners of the house and their interest in the two watercrafts burned in the fire, and (2) their additional living expenses. Farm Bureau also contends that Gaylon committed a fraudulent act by submitting false receipts as documentation for their claimed additional living expenses.

Regarding the first of these points, Farm Bureau introduced the insurance application, signed by Gaylon, reflecting that the Footes had indicated the land was not owned by someone other than the applicants and that there were no occupants on the premises other than the owner. Gaylon testified that when he applied for the insurance policy, he explained the ownership situation to Farm Bureau's agent, Brad Walker, and that Walker then completed the application for insurance. Gaylon testified that he also told this information to Farm Bureau's adjuster, Kent Bard, after the fire.

Farm Bureau presented the property inventory completed by the Footes, wherein they claimed a loss of $12,500.00 for the value of the two Polaris watercrafts. It also presented the titles to the watercrafts, showing them to be owned by Charles Hamilton. Gaylon admitted that when he signed the inventory, he understood that he was representing that the items listed were his property. He maintained, however, that he held more than a majority of the ownership interest in the watercrafts. He explained that Hamilton was his partner and that Hamilton's ownership interest was approximately $3,500.00, while the remaining interest was his.

Farm Bureau also presented evidence showing that the Footes misrepresented the nature of their interest in the trailer in which

they were living after the fire. Farm Bureau questioned Gaylon about a letter that he had written to the insurance company stating that he and Tammy had rented the trailer for $750.00 per month. Gaylon admitted that the information in the letter was wrong, because he and Tammy had actually purchased, not rented, the trailer. Gaylon also admitted that he had a friend write fictitious receipts as proof of the rental fees for the trailer. On rebuttal, Gaylon explained that he presented the false receipts as a result of conversations with Bard, wherein Bard agreed to pay the Footes $700.00 a month for additional living expenses. Gaylon stated that Bard told him that they could live with their parents and still receive $700.00 per month, but that they would still have to furnish receipts for their expenses so that he would have something to put in his file. According to Gaylon, Bard told him: "It's your money and we'll pay it to you[.]"

Bard confirmed the substance of these conversations, testifying that he told the Footes that Farm Bureau would pay additional living expenses even if they were living with their parents and not paying any money. Bard also stated that he told the Footes that they had to have some documentation to justify payment of those living expenses.

 Whether these actions were fraudulent or the statements were materially false was a question for the jury. This court has recognized that once the insured establishes a prima facie case for recovery under the insurance policies, the burden shifts to the insurer to prove that the damages claimed were not covered under the policy. *See Reynolds v. Shelter Mut. Ins. Co.*, 313 Ark. 145, 852 S.W.2d 799 (1993). The jury was instructed on this issue as follows:

> Farm Bureau contends that the insurance contract is void because of certain actions and representations of the Plaintiffs.
>
> If you find by a preponderance of the evidence, either before or after the loss, there have been fraudulent acts or material false statements made or material facts or circumstances concealed or misrepresented in regard to the insured property, the insured coverage, or the loss by the Plaintiffs, then your verdict must be for the Defendants and against the Plaintiffs.

The jury apparently believed the explanations offered by the Footes and concluded that Farm Bureau had not met its burden on this

issue. We find no error with this conclusion. The jury is free to believe or disbelieve the testimony of any witness. *Bearden v. J.R. Grobmyer Lumber Co.*, 331 Ark. 378, 961 S.W.2d 760 (1998). This is true even if the testimony is uncontradicted or unimpeached. *See Anderson v. Graham*, 332 Ark. 503, 966 S.W.2d 223 (1998).

### C. Suspicious Origin of the Fire

Lastly, Farm Bureau contends that the evidence supports a finding that the Footes intentionally set fire to the property. While we agree that the evidence indisputably showed that the fire had suspicious origins, we affirm the jury's verdict.

During the trial, testimony was presented from several expert witnesses showing that the fire started in the area of the kitchen and utility room, near the entrance to the garage. The presence of accelerants was detected in the living room floor and near the kitchen door. No accidental cause for the fire was discovered, and it was the conclusion of Farm Bureau's fire investigation experts that the fire was intentionally set. No direct proof, however, was offered by Farm Bureau connecting the Footes to the suspicious cause of the fire. Although it attempted to show that only the Footes had the opportunity to commit the fire, based on their admissions that the home was locked and no one else had keys, Farm Bureau's fire specialist, Rodger Smith, conceded that someone else could have broken into the home and started the fire. He stated that a break in could have been possible, as the back door was completely missing from the home.

Perhaps more significant is the fact that Farm Bureau presented no convincing evidence demonstrating a motive for the fire. Although Smith opined that the motive of financial gain was usually present in fires of this nature, Farm Bureau produced no specific evidence that such was the case here. Smith merely surmised that the financial gain was derived from the Footes having their mortgage paid in full and thus owning the house free and clear. Smith's theory was not supported by the evidence, however, which demonstrated that the Footes suffered a tremendous loss as a result of the fire. Gaylon testified that everything that they had worked for over the course of many years was gone. Tammy testified about the personal items destroyed that were of sentimental

value to them, such as a collection of the children's school photographs, a painting done by a family friend that had been given to them as a wedding present, Tammy's angel collection, and approximately twenty sound tracks for music that Tammy performed at church. Viewing the evidence in the light most favorable to the Footes, as we are required to do, we conclude that the jury's verdict on this point is supported by substantial evidence.

## II. Scientific Expert Testimony

For its second point for reversal, Farm Bureau argues that the trial court erred in refusing to allow Trooper Doug Estes, an investigator with the Arkansas State Police, to testify regarding the alleged superior ability of his canine partner, Benjamin, to detect the presence of accelerants after a fire. Estes testified that as a result of his training, Benjamin has the ability to discriminate between different types of chemicals, so that when the dog alerts on a particular spot at a fire scene, it signifies the presence of accelerants. Estes stated that Benjamin has been trained extensively in this area and was required to test at an accuracy rate of 100 percent in order to receive his certification. Estes stated further that it has been proven in numerous cases that a dog's nose is more sensitive than the laboratory equipment used by forensic chemists. He stated that a dog's nose can detect 300 parts per billion, while the laboratory tests detect 100 parts per million. The source of his information was a master's thesis written by Kevin Lockridge, the purported director of the Florida State Crime Laboratory. Farm Bureau offered this testimony to explain why the dog made five "hits," while the chemist only detected measurable amounts of accelerants in two samples. The trial court denied admission of the proffered testimony based on the holding in *Daubert*, 509 U.S. 579. This court has not previously adopted the holding in *Daubert*. We do so now.

In *Daubert*, 509 U.S. 579, the petitioners urged the Court to dispose of the test established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which provided that "expert opinion based on a scientific technique is inadmissible unless the technique is 'generally accepted' as reliable in the relevant scientific community." 509 U.S. at 584. They contended that the *Frye* test had been superseded by the adoption of the Federal Rules of Evidence. The Court agreed

and established the following inquiry to be conducted by the trial court:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 592-93 (footnotes omitted). The Court concluded that a key consideration is whether the scientific theory or technique can be or has been tested. Other considerations include whether the theory or technique has been subjected to peer review and publication, the potential rate of error, and the existence and maintenance of standards controlling the technique's operation. Additionally, the Court recognized that general acceptance in the scientific community can have a bearing on the inquiry. The Court emphasized that the inquiry envisioned by Federal Rule of Evidence 702, which is identical to our Rule 702, is a flexible one:

> Its overarching subject is the scientific validity — and thus the evidentiary relevance and reliability — of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594-95 (footnote omitted).

■■■ Two years before the Court's decision in *Daubert*, this court adopted a strikingly similar approach to the admission of novel scientific expert testimony in *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). This approach, based on Arkansas Rules of Evidence 401, 402, and 702, requires the trial court to conduct a preliminary inquiry focusing on (1) the reliability of the novel process used to generate the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the connection between the evidence to be offered and the disputed factual issues in the particular case. Under this approach, reliability is the critical element. There are a number of factors that bear upon reliability, including "the novelty of the new technique, its relationship to more established modes of scientific analysis, the

existence of specialized literature dealing with the technique, the qualifications and professional stature of expert witnesses, and the non-judicial uses to which the scientific techniques are put." *Id.* at 186, 820 S.W.2d at 431 (citing *Andrews v. State*, 533 So. 2d 841 (Fla. Dist. Ct. App. 1988) (citing *United States v. Downing*, 753 F.2d at 1238-39, and Weinstein & Berger, *Weinstein's Evidence* ¶ 702[03] (1991))).

▆▆ In the present case, we conclude that the proffered testimony concerning the dog's alleged superior ability to detect the presence of accelerants does not pass muster using either the *Daubert* or *Prater* analysis. Farm Bureau simply did not make any showing regarding the scientific validity of the evidence. For instance, Estes did not produce the study allegedly conducted by Lockridge, so there was no way of ascertaining the techniques used or the potential rate of error. There was no evidence that this scientific theory had ever been tested or subjected to peer review, or that it had been otherwise embraced by the particular scientific community. In short, Farm Bureau, as the proponent of the novel scientific evidence, failed to carry its burden of proof on the issue of reliability. *See Houston v. State*, 321 Ark. 598, 906 S.W.2d 286 (1995). We thus affirm the trial court's ruling.

### III. Mistrial

For its third point for reversal, Farm Bureau argues that the trial court erred in denying its motion for mistrial as a result of four questions submitted to the court by the jury during a recess. The record reflects that during Farm Bureau's presentation of its defense, the trial court was given a note from the jury asking four questions: (1) "Who first discovered the fire?"; (2) "Who were the firemen/department on call?"; (3) "What emotions were observed on the Footes on arriving on the scene?"; and (4) "Why did the insurance company take the payments on the policy if the house ownership was in question?"

After reading the questions to the parties, the trial judge proposed telling the jurors that he could not answer the questions and then admonishing them that all the evidence had not yet been presented. In response, counsel for Farm Bureau proposed that the jurors be told that at the conclusion of the case, the court will

instruct them and they will decide the case based on the law given and the evidence heard. Counsel for the Footes then expressed his concern that the jurors were prematurely talking about these issues before all the evidence had been presented. Counsel for Farm Bureau then agreed with that concern and moved for a mistrial. Alternatively, Farm Bureau asked the court to *voir dire* the jurors to determine the extent, if any, of their deliberations on the issues in the case.

The trial court denied the motion for mistrial, finding that Farm Bureau's concern would be cured by admonishing the jurors that they are to base their decision on the evidence presented and the instructions given at the conclusion of the trial. The trial court found further that conducting *voir dire* of the jurors individually would only complicate the situation, rather than cure it.

■■ ■■ It is well settled that a mistrial is a drastic and extreme remedy that should be granted only when there has been error so prejudicial that justice cannot be served by continuing the trial or when fundamental fairness of the trial itself has been manifestly affected. *See Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998). The trial court has wide discretion in granting or denying a motion for a mistrial, and we will not disturb the court's decision absent an abuse of discretion or manifest prejudice to the movant. *Id.* A mistrial will only be granted where any possible prejudice could not have been removed by an admonition to the jury. *Id.* Regarding allegations of juror misconduct, the moving party bears the burden of proving that a reasonable possibility of prejudice resulted. *Sunrise Enters., Inc. v. Mid-South Rd. Builders, Inc.*, 337 Ark. 6, 987 S.W.2d 674 (1999); *Berry v. St. Paul Fire & Marine Ins. Co.*, 328 Ark. 553, 944 S.W.2d 838 (1997).

Farm Bureau relies primarily on the case of *United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993), for the holding that "[i]t is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *Id.* at 688. The facts in *Resko* establish that seven days into a nine-day trial, a juror approached a court officer and reported that the members of the jury had been discussing the case during the recesses and while waiting in the jury

room. The trial court then summoned the jurors, informed them of the problem, and gave each of them a questionnaire to complete. The two questions asked of the jurors were (1) whether they had discussed the facts of the case amongst themselves during the trial, and (2) if so, whether they had formed an opinion about the guilt or innocence of the defendants. All twelve jurors answered "yes" to the first question and "no" to the second question. The trial court made no further inquiries of the jurors, and the defendants were eventually convicted. The court of appeals vacated the convictions on the ground that the trial court should have conducted individual inquiry of the jurors. The court held:

> Although ordinarily a defendant must establish prejudice before a new trial will be ordered, in the circumstances here, in which there is *unequivocal proof of jury misconduct* discovered mid-trial coupled with the failure by the district court to evaluate the nature of the jury misconduct or the existence of prejudice, we conclude that a new trial is warranted. Given the importance of the Sixth Amendment rights at stake and the relative ease with which the district court here could have properly assessed the impact of the jury misconduct, it would be unfair to penalize the defendants for lack of evidence of prejudice. We are thus willing, *in these limited circumstances*, to carve out an exception to the rule that a defendant must demonstrate prejudice before a new trial is warranted.

*Id.* at 694 (emphasis added). It is clear from this ruling that the court placed great emphasis on the fact that it was a criminal trial implicating the protections of the Sixth Amendment, and that it was uncontroverted that the jurors had engaged in premature deliberations. The present case is thus distinguishable from *Resko*.

Under the facts presented here, we think the better case is *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998), *cert. denied*, 526 U.S. 1007 (1999). There, an alternate juror reported to the court clerk the substance of a discussion that had taken place in the jury room, during the course of the trial. The jurors had been conversing about who might be the alternates, and one juror said, "I hope I'm not the hold-out juror." *Id.* at 1185. In response, another juror stated, "It wouldn't be very hard. I think we all know what the verdict should be." *Id.* (footnote omitted). The trial judge did not conduct an individual inquiry with the jurors; rather, he admonished them about the importance of maintaining an open

mind with respect to all aspects of the case. He also reminded them of the oath they had taken to decide the case based on all the evidence presented. The court of appeals held that the district court's refusal to conduct a hearing on the issue was not an abuse of discretion. The court distinguished between intrajury misconduct and extraneous influences on the jury, such as jurors becoming privy to prejudicial information not introduced into evidence or having improper contacts with parties or witnesses. The court explained:

> Although premature discussions among jurors may prejudice the defendant, intrajury misconduct generally has been regarded as less serious than extraneous influences on the jury. Consequently, an allegation of intrajury misconduct may or may not warrant a hearing. . . .
>
> . . . Ultimately, the court must weigh the benefits of having a hearing, including the ability perhaps to ascertain more fully the extent and gravity of the possible prejudice, against the risks inherent in interrupting the trial and possibly placing undue emphasis on the challenged conduct.

*Id.* at 1186–87 (citations omitted). The court concluded that although a hearing may have been preferable under the circumstances, the trial court had not abused its discretion.

 Here, as in the foregoing federal cases, the misconduct alleged was of the intrajury type; however, unlike those cases, there was no actual evidence that any jurors had engaged in premature discussions of the case. Rather, as the trial court pointed out, the four questions could very well have come from one juror mulling over issues in his or her mind. There was simply no affirmative proof that the jurors had been discussing the case. Moreover, the trial court's admonition was precisely the relief initially requested by Farm Bureau. Under these circumstances, we conclude that the trial court did not abuse its discretion in refusing to grant the mistrial or to conduct an individualized inquiry of the jurors. As indicated in *McVeigh*, such an inquiry may have only served to place undue emphasis on the challenged conduct. We thus affirm on this issue.

## IV. Jury Instructions

For its fourth point for reversal, Farm Bureau argues that the trial court erred in instructing the jurors that for the homeowners policy to be voided, they must find by a preponderance of the evidence that "there have been fraudulent acts or material false statements made or material facts or circumstances concealed or misrepresented in regard to the insured property, the insurance coverage, or the loss[.]" Particularly, Farm Bureau argues that the word "material" should not have been used to modify the term "false statements," because no such modification is reflected in the policy itself. Farm Bureau relies on this court's decisions holding that an insurer may contract with its insured on whatever terms the parties may agree, so long as it is not contrary to statute or public policy. *See Western World Ins. Co. v. Branch*, 332 Ark. 427, 965 S.W.2d 760 (1998); *Shelter Gen. Ins. Co. v. Williams*, 315 Ark. 409, 867 S.W.2d 457 (1993). Thus, Farm Bureau argues that the trial court erred in refusing to instruct the jury with the exact language of the policy. We disagree.

The trial court concluded that the law requires false statements to be material before an insurance policy may be voided by the insurer. The trial court explained:

> In looking at this and trying to analyze the law in regards to this, I believe that the statements, at least false statements, must have some degree of materiality to them.... That if it were otherwise, if it were any false statement, whether it be innocent or not, you could void the policy and that would be against the public policy, and obviously the company is looking at material false statements.

We find no error with this ruling, particularly in light of the fact that Farm Bureau's proffered instruction provided: "If you find from the evidence that any policyholder concealed or misrepresented any *material* fact relating to the insurance coverage, either before or after the fire, then your verdict must be for the Defendants on that issue and against the Plaintiffs." (Emphasis added.) Moreover, Farm Bureau's letter to the Footes specifically reflected that their claim was being denied because they "intentionally concealed or misrepresented *material* facts or circumstances relating to your loss and/or coverage." (Emphasis added.)

██ Furthermore, the language of the policy itself raises the inference that mere false statements are not sufficient to void the policy. The policy reflects that it becomes void when there have been "*fraudulent* acts or false statements made or *material* facts or circumstances *concealed* or *misrepresented in regard to* the insured property, the insured coverage or the loss." From this context, it appears that the term "false statements" does not apply to statements that are merely incorrect or are without consequence to the loss or the policy itself. Although there is no specific statutory provision on this issue, our construction of this policy language is consistent with the statutory law regarding false information contained in applications for life or disability insurance. Arkansas Code Annotated § 23-79-107 (Repl. 1999) provides in pertinent part that misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent recovery under the policy *unless* either: (1) fraudulent; (2) material to the acceptance of the risk or to the hazard assumed by the insurer; or (3) the insurer in good faith would not have issued the policy, or at least not in as large an amount or at the same premium rate, if the true facts had been known to it. In any event, the policy language is, at best, ambiguous, and we must resolve the ambiguity in favor of the insureds. *See, e.g., Phelps v. U.S. Life Credit Life Ins. Co.*, 336 Ark. 257, 984 S.W.2d 425 (1999); *State Farm Mut. Auto Ins. Co. v. Traylor*, 263 Ark. 92, 562 S.W.2d 595 (1978). Accordingly, the trial court did not abuse its discretion is refusing to give the proffered instruction. *See Edwards*, 335 Ark. 470, 984 S.W.2d 366.

### V. Rebuttal Evidence

██ ██ For its fifth point for reversal, Farm Bureau argues that the trial court abused its discretion in allowing the Footes to present rebuttal evidence regarding their emotional states after the fire and the substance of conversations between Gaylon Foote and Farm Bureau's adjuster pertaining to the issue of receipts for additional living expenses. Admissibility of rebuttal evidence lies within the sound discretion of the trial court, and we will not reverse absent a showing of abuse of that discretion. *Edwards*, 335 Ark. 470, 984 S.W.2d 366; *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998). Genuine rebuttal is evidence that is offered in reply to new matters; however, the fact that the evidence could have been presented in

the plaintiff's case-in-chief does not preclude its introduction on rebuttal if it serves to refute evidence raised by the defense. *Id.*

 ██ The record reflects that the first rebuttal witness, Larry Hill, testified that he had contact with Gaylon about a week after the fire. Hill stated that he and Gaylon went to the house and looked around the burned structure. Hill stated that Gaylon was very sad and depressed about his house. No objection was made to this testimony. The next witness, Tammy Foote's mother, was asked to describe the Footes' emotions in response to the fire. Farm Bureau objected and argued that such evidence should have been presented in the Footes' case-in-chief. The trial court overruled the objection. Thereafter, three additional witnesses testified about the Footes' emotions. The trial court did not abuse its discretion in allowing the testimony, as it was particularly relevant to refute Farm Bureau's defense, *i.e.*, that the Footes set fire to their own home to collect the insurance proceeds. Moreover, Farm Bureau failed to object to the evidence at the first opportunity, during Hill's testimony. It is well settled that to preserve a point for appeal, a proper objection must be asserted at the first opportunity. *Edwards*, 335 Ark. 470, 984 S.W.2d 366.

 As for Gaylon Foote's testimony about conversations he had with the insurance adjuster, Kent Bard, we likewise find no abuse of discretion. During Farm Bureau's defense, Rodger Smith testified that Gaylon had asked Bard for additional living expenses and that Bard had called Smith for authorization. Smith stated that he then sent a letter to Gaylon, advising him that Farm Bureau had not received enough receipts and documentation to support the payment of living expenses. Smith then testified that he was aware that Bard had also requested appropriate documentation of rental expenses from the Footes. On rebuttal, Gaylon described the substance of his conversations with Bard regarding Farm Bureau's requests for the documentation. Accordingly, the trial court did not abuse its discretion by permitting Gaylon's rebuttal testimony.

## VI. Attorney's Fees and Statutory Penalty

For its last point, Farm Bureau argues that the trial court erred in awarding attorney's fees and a twelve-percent penalty to the Footes, pursuant to Ark. Code Ann. § 23-79-208 (Repl. 1999).

Subsection (a)(1) provides that in all cases where loss occurs, and the insurance company fails to pay the losses within the time specified in the policy after demand has been made, the insurance company "shall be liable to pay the holder of the policy or his assigns, in addition to the amount of the loss, twelve percent (12%) damages upon the amount of the loss, together with all reasonable attorney's fees for the prosecution and collection of the loss." Subsection (d) provides that the right to recover the twelve-percent penalty is conditioned upon the amount recovered for the loss being within twenty percent of the amount demanded or sought in the suit.

Farm Bureau asserts that because the Footes sought their policy limits in their complaint and because the judgment recovered by them was set off by the monies paid to the banks for the mortgage and the lien on the vehicle, the Footes did not recover within twenty percent of the amount demanded. This assertion is erroneous under this court's decision in *Farmers Mut. Ins. Co. v. Lane*, 278 Ark. 53, 643 S.W.2d 544 (1982). There, this court held that "[i]t does not matter whether the actual payment under the policy is made to the insured or to the loss payee in order for the insureds to be entitled to the statutory penalty and attorneys' fees when payment by the [insurance] Company is late." *Id.* at 56, 643 S.W.2d at 546 (citing *Farm Bureau Mut. Ins. Co. v. Shaw*, 269 Ark. 757, 600 S.W.2d 432 (Ark. App. 1980)). Likewise, in *Shaw*, 269 Ark. at 758, 600 S.W.2d at 433, the court of appeals held that the statutory penalty and attorney's fees "applies regardless whether the late payment is made to the insured or insured's mortgagee." Accordingly, we find no merit to Farm Bureau's argument on this point, and we affirm.

THORNTON, J., not participating.