SLIP OPINION

Cite as 2015 Ark. App. 426

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CR-14-1002

| | |
|---|---|
| | **Opinion Delivered** August 26, 2015 |
| JIMMY NORTHERN | |
| APPELLANT | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [No. CR-2013-34 (CT)] |
| V. | |
| STATE OF ARKANSAS | HONORABLE CINDY THYER, JUDGE |
| APPELLEE | AFFIRMED |

## LARRY D. VAUGHT, Judge

Appellant Jimmy Northern was charged in the Mississippi County Circuit Court with first-degree felony murder, aggravated robbery, and felon in possession of a firearm. On the morning of trial, the State orally amended the information, charging Northern with first-degree murder. At the conclusion of the evidence, the trial court gave the jury an instruction for second-degree murder as a lesser-included offense of first-degree murder. The jury thereafter found Northern guilty of second-degree murder. He was sentenced, as a habitual offender, to serve forty-one years' imprisonment in the Arkansas Department of Correction and to pay a $15,000 fine. On appeal, Northern argues that the trial court abused its discretion in admitting the expert testimony of a firearm and toolmark examiner and in instructing the jury on the lesser-included offense of second-degree murder. We affirm.

Testimony at trial revealed that on the morning of December 1, 2012, Thomas Essig was found dead with multiple gunshot wounds. Detective Josh Long of the Blytheville Police

Department led the investigation. He testified that he found five .25-caliber shell casings near Essig's body. Detective Long also testified that he interviewed eyewitness Antwane Blair, who led officers to Traveon Sims. Sims led officers to Theodore Love, who possessed a Phoenix Arms .25-caliber semiautomatic that was believed to have been used in the shooting death of Essig. Detective Long sent the firearm to the state crime laboratory for testing.

Blair testified that he lived in an apartment across the street from where Essig was killed. Blair said that he had surveillance set up at his apartment because he sold marijuana there. On his camera, he saw two men run by yelling and fighting. Blair went to his back door and watched. One of the men he knew, Rodney Willis, yelled for help, claiming that he was being robbed. Blair did not know the other man, who was later identified as Essig. Blair ran back inside and called for a ride to pick him up because he did not want to be there when the police arrived.

Blair was loading a car with his drug paraphernalia when he saw Northern, who lived in the same apartment building and was related to Willis, arrive. Northern jumped out of his car, started fighting Essig, but left to retrieve a gun from his (Northern's) car. Blair stated that Northern pointed the gun at Essig and asked him "if he prayed for his sin because he was going to die today." Blair testified that Northern was "fixing to shoot [Essig] but he gave the gun to [Willis] and told him he was going to get his stripes today." According to Blair, within seconds "the gun was flaming." Blair said that he heard six or seven shots. At trial, Blair identified the gun used by Willis as Northern's gun. Blair stated that Traveon Sims said that he bought the gun from Northern. Blair told Sims to get rid of the gun because it was a murder weapon.

2

Sims testified that he bought a gun from Northern on December 1, 2012, and Sims identified the gun at trial. Because he suspected that the gun had been used in a murder, Sims sold the gun to Theodore Love. Love testified that he bought the gun from Sims and later turned it over to the police. Dr. Joseph Hoff, a forensic DNA examiner, testified that he tested a swab of DNA found on that gun and that it was consistent with Essig's DNA.

Dr. Stephen Erickson, the Deputy Chief Medical Examiner of the Arkansas State Crime Laboratory, performed an autopsy on Essig on December 3, 2012. He concluded that the cause of death was multiple gunshot wounds.[1] Essig suffered one gunshot wound to his hand and seven to his head. Dr. Erickson stated that the gunshot wounds to the head were grouped together, traveled in the same general direction, and entered the brain cavity. Dr. Erickson retrieved seven .25-caliber bullets from Essig's head and sent them to the crime lab for testing. He added that there was no evidence that the gun was in contact with or close to the skin around the entrance wounds. He opined that the gun had been fired at least three feet from Essig's head. Dr. Erickson concluded that Essig's death was a homicide.

Over the objection of Northern, the State introduced the expert testimony of James R. Looney, supervisor of the Firearm and Toolmark Section of the Arkansas State Crime Laboratory. Looney opined that four of the shell casings (found near Essig's body) and the seven bullets (retrieved during Essig's autopsy) were fired from Northern's gun.

At the conclusion of the evidence, the State requested a jury instruction on the lesser-included offense of second-degree murder. Northern objected, contending that there was no

_____

[1]Essig also had multiple scrapes, bruises, and sneaker footprints on his face and body.

SLIP OPINION

evidence to support the lesser-included offense; therefore, he was either guilty of first-degree murder or was innocent. The State responded that second-degree murder is a lesser-included offense of first-degree murder and that when Northern handed Willis the gun, he (Northern) was "practically certain" that Willis was going to shoot Essig. The trial court agreed and gave the second-degree-murder instruction to the jury.[2] The jury found Northern guilty of second-degree murder.[3] This appeal followed.

## *I. Exclusion of Expert Witness*

Northern first argues that the trial court abused its discretion in admitting the expert testimony of the firearm and toolmark examiner that the seven bullets found in Essig's head and the four shell casings found near Essig's body had been fired from Northern's gun. He claims that the testimony violated Arkansas Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

At a pretrial hearing on Northern's motion to exclude the evidence, Looney testified that he had been a firearm and toolmark examiner for thirty-six years. He said that the science of firearm and toolmark identification was based on the fact that no two guns are made exactly alike. When a gun is fired, the bullet passing through the barrel of the gun will be marked based

---

[2]The jury was also read the accomplice-liability instruction that stated that "the State does not contend that Jimmy Northern acted alone in the commission of the offenses charged. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense."

[3]By agreement of the parties, an order of nolle prosequi was entered on the charge of possession of a firearm by certain persons. The aggravated-robbery charge was dismissed with prejudice by an order granting Northern's motion for partial directed verdict.

SLIP OPINION

on the imperfections in the barrel. To perform the testing, the examiner will use the subject gun and fire test bullets into a tank of water. Using a microscope, the examiner will then compare the markings on the test bullets to the markings on the evidence bullets, looking for lines that "match up." Looney took photographs of the test bullets and the evidence bullets to aid in explaining the science, but he said that he did not rely on the photographs to reach his conclusions.

After explaining the science of firearm and toolmark examinations, Looney, employing a Power-Point presentation, explained how the science satisfied *Daubert*. He said that over the past fifty years many studies have been published documenting the testability of the evidence and the tools, and he discussed a few of those studies. He stated that the science is generally accepted and that numerous colleges and universities offer courses in firearm and toolmark identification. He added that the science has been accepted in court testimony for almost ninety years. Looney identified several peer-reviewed journals on the science of firearm and toolmark examinations. And he testified that studies have shown that the science has a 0–1.9% rate of error based on thousands of tests. Finally, he stated that the science had established and maintained operational guidelines, standards, and protocols for conducting analytical testing, monitoring quality assurance, and controls.

At the pretrial hearing, Northern argued that Looney's testimony should be excluded because it did not involve an exact science, there was a lack of theory and technique that could be tested, it was not subject to peer review, there was no way to test the known rate of errors, and there was a lack of general acceptance of the theory or technique. Northern claimed that

Looney's opinion was "guesswork" as to whether the bullets had been fired from Northern's gun. Northern pointed out that the photographs show lines that do not match up on the test and evidence bullets despite Looney's conclusion that the two matched and had been fired from the same gun. Finally, Northern contended that the jury could look at the bullets and the casings and determine for themselves whether they had been fired from a particular firearm.

The trial court denied Northern's motion to exclude Looney's testimony, finding that it satisfied each of the five *Daubert* criteria for reliability. The trial court further held that Looney's testimony was admissible pursuant to Rule 702 of the Arkansas Rules of Evidence because it would assist the jury in understanding the evidence presented. On appeal, Northern reiterates the arguments made at the pretrial hearing and also argues that the State failed to introduce into evidence the actual documents that support Looney's testimony that his science satisfied the *Daubert* criteria.

Arkansas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ark. R. Evid. 702 (2014). If some reasonable basis exists whereby the trial court may determine that the witness has knowledge of the subject beyond that of ordinary knowledge, and his expert testimony will assist the trier of fact in understanding the evidence presented or in determining a fact in issue, the trial court must qualify the witness as an expert and admit his testimony. *Fowler v. State*, 2011 Ark. App. 70, at 2 (citing *Davis v. State*, 330 Ark. 501, 956 S.W.2d 163 (1997); Ark. R. Evid. 702).

Additionally, the expert testimony must be relevant and not misleading or confusing to the jury. *Id.* at 2. There is a decided tendency to permit the fact-finder to hear the testimony of persons having superior knowledge in the given field, unless they are clearly lacking in training and experience. *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 371, 268 S.W.3d 905, 914 (2007). We review a trial court's decision to qualify a witness as an expert in a particular field under an abuse-of-discretion standard. *Fowler*, 2011 Ark. App. 70, at 2.

We hold that the trial court did not abuse its discretion in finding Looney qualified as an expert witness under Rule 702. He has worked in the firearm-and-toolmark-examination field for thirty-six years and is currently the chief firearm and toolmark examiner at the Arkansas State Crime Laboratory. He has been certified by the Association of Firearm and Toolmark Examiners and has attended twenty-one annual training seminars between 1979 and 2012. Certainly, he can offer specialized information about the science of firearm and toolmark examinations beyond the common knowledge of the jury and has vast training and experience in the field.

We also hold that the trial court did not abuse its discretion in finding that Looney's testimony regarding his firearm and toolmark examination of Northern's gun satisfied *Daubert*. In *Daubert*, the Supreme Court held that the trial court must determine whether scientific evidence is relevant and reliable and whether the reasoning behind the scientific evidence is scientifically valid and can be applied to the facts of the case. 509 U.S. at 592–93. The Court in *Daubert* identified five criteria in determining whether a theory or technique is scientific knowledge that will assist the trier of fact: (1) whether it can be and has been tested, (2) whether

it has been subjected to peer review and publication, (3) what is the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the scientific community has generally accepted the theory. *Id.* at 593–94. The Arkansas Supreme Court adopted the *Daubert* analysis in *Farm Bureau Mutual Insurance Co. of Arkansas, Inc. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000). Under *Daubert* and *Foote*, the trial court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts of the case. *Richardson v. Union Pac. R.R. Co.*, 2011 Ark. App. 562, at 5, 386 S.W.3d 77, 80–81 (citing *Coca-Cola Bottling Co. of Memphis v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003)).

Under these guidelines, we hold that the trial court did not abuse its discretion by admitting Looney's testimony after finding that his science satisfied each of the *Daubert* criteria for reliability and that it would assist the jury in understanding the evidence. Looney's testimony established that he had received extensive training and education in firearm and toolmark examinations and also had vast experience in conducting these examinations. Further, Looney testified that firearm and toolmark science has been studied and tested numerous times; it has been in existence for many years and is a well-recognized and generally accepted science; there have been multiple peer-review journals published on the topic; and a low rate of error has been established after much testing. Looney also explained that standards and guidelines have been established in order to control the technique. This testimony establishes reliability of the science well beyond "guesswork," as argued by Northern.

8

While Northern argues that the State failed to introduce any "material evidence," i.e., the actual tests, studies, manuals, peer-review publications, or standards supporting Looney's testimony that the science meets the *Daubert* criteria, this objection was not raised at the pretrial hearing or at trial. An argument is not preserved on appeal unless the appellant raised and made the argument at trial and obtained a ruling on it. *Mason v. State*, 2014 Ark. App. 285, at 5, 435 S.W.3d 510, 513. Further, Looney's *Daubert* Power-Point presentation was introduced into evidence (in paper form) by Northern at the pretrial hearing. Thus, the only documentary evidence in the record supports Looney's testimony that his science is reliable under *Daubert*. Therefore, we affirm on this point.

## II. Lesser-Included Offense of Second-Degree Murder

Northern's second point on appeal is that the trial court abused its discretion in instructing the jury on second-degree murder as a lesser-included offense of first-degree murder. An instruction on a lesser-included offense is appropriate when it is supported by even the slightest evidence. *Green v. State*, 2012 Ark. 19, at 6, 386 S.W.3d 413, 416. Once an offense is determined to be a lesser-included offense, the trial court is obligated to instruct the jury on that offense only if there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the lesser-included offense. *Id.*, 386 S.W.3d at 416–17. A trial court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Id.*, 386 S.W.3d at 417.

The amended information charged Northern with first-degree murder pursuant to Arkansas Code Annotated section 5-10-102(a)(2) (Supp. 2011), which provides that a person

commits the offense if, with the purpose of causing the death of another person, the person causes the death of another person. A person acts purposely with respect to his conduct or a result of his conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013).

Once the parties rested, the State requested a lesser-included-offense instruction on the offense of second-degree murder under Arkansas Code Annotated section 5-10-103(a)(1) (Supp. 2011), which provides that a person commits the offense if he knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life. A person acts knowingly with respect to a result of the person's conduct when he is aware that it is practically certain that his conduct will cause the result. Ark. Code Ann. § 5-2-202(2)(B).

In *McCoy v. State*, 347 Ark. 913, 924, 69 S.W.3d 430, 437 (2002), our supreme court held that the definition of "purposely" encompasses the culpable mental state of acting knowingly with extreme indifference, which requires deliberate conduct with a knowledge or awareness that one's actions are practically certain to bring about the prohibited result. The court further held that the combination of knowledge and extreme indifference required proof that the defendant acted with more than mere knowledge, but less than purposeful intent. *Id.*, 69 S.W.3d at 437. Therefore, the court concluded that second-degree murder under section 5-10-103(a)(1) is a lesser-included offense of first-degree murder under section 5-10-102(a)(2), as it differs from the greater offense only to the extent that it requires a lesser kind of culpable mental state. *Id.*, 69 S.W.3d at 437 (citing Ark. Code Ann. § 5-1-110(b)(3)).

SLIP OPINION

Because second-degree murder under section 5-10-103(a)(1) is a lesser-included offense of first-degree murder under section 5-10-102(a)(2), we must next determine whether there was a rational basis for a verdict acquitting Northern of first-degree murder and convicting him of second-degree murder. He contends that there was no rational basis in the evidence to convict him of second-degree murder. He argues that the evidence showed that he either committed first-degree murder or that he was innocent:

> The testimony was clear if believed by the jury that Northern fought with Essig, retrieved a gun, pointed a gun at Essig, told Essig he should pray for his sins because he was going to die today and handed the gun to Willis with the comment, "it is time for you to earn your stripes." Willis then shot Essig in the head seven times. There is no way that this could be considered anything other than purposeful conduct.

We disagree and hold that the evidence in this case provides a rational basis for an acquittal on the first-degree-murder charge and a conviction on the second-degree-murder charge. While Northern pointed his gun at Essig and told him he was going to die, Northern did not shoot and kill Essig. Instead, he handed his gun to Willis and told him he was going to "get his stripes today." The jury could have found that Northern did not act with the purpose of causing the death of Essig as required for first-degree murder because Northern could not have known with absolute certainty what Willis would do. After receiving the gun from Northern, Willis could have done any number of things other than kill Essig. Willis could have fired the gun in the air to frighten Essig, he could have used the firearm to beat Essig, he could have shot Essig in the foot only, or he could have refused to use or fire the weapon at all. There was no evidence in the record that Willis made any statements threatening to kill Essig.

SLIP OPINION

The jury could have concluded that Northern possessed the lesser culpable mental state of being practically certain that Willis would shoot and kill Essig. In other words, the jury could have concluded that Northern knowingly caused the death of another person under circumstances manifesting extreme indifference to the value of human life in that he was "practically certain" that his conduct would cause the death of Essig.

Northern likens the facts of his case to those in *Britt v. State*, 344 Ark. 13, 38 S.W.3d 363 (2001). In *Britt*, our supreme court affirmed the trial court's denial of the lesser-included-offense instruction of second-degree murder because there was no rational basis in the evidence to give it. *Id.* at 23, 38 S.W.3d at 370. There, the evidence showed that after making three death threats, the appellant or his accomplices placed a gun at the head of the victim and pulled the trigger at point-blank range, shooting him once on the forehead and once on the top of the head—in an execution-style manner. *Id.*, 38 S.W.3d at 370. Further, all of the evidence in *Britt* established that Britt *and* his accomplices acted only with the mental state of purposely causing the death of the victim. *Id.*, 38 S.W.3d at 370.

The case at bar is distinguishable from *Britt* because all of the evidence did not establish that Northern *and* Willis acted only with the mental state of purposely causing the death of Essig. While Northern made several threatening comments to Essig, there was no evidence in the record of Willis's intent prior to the shooting. Also, unlike *Britt*, the evidence in the case at bar did not demonstrate that Essig was murdered in an execution-like manner. Therefore, as set forth above, the jury could have found (and actually did find) that Northern had the lesser culpable mental state of knowingly causing the death of Essig under circumstances manifesting

12

extreme indifference to the value of human life—that he was practically certain that his conduct would cause Essig's death. With this rational basis for the second-degree-murder conviction, we hold that the trial court did not abuse its discretion in instructing the jury on the lesser-included offense of second-degree murder, and we affirm on this point.

Affirmed.

WHITEAKER and HIXSON, JJ., agree.

*John H. Bradley*, Chief Public Defender, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.