Cite as 2024 Ark. App. 471

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-23-71

| | | |
|---|---|---|
| | | **Opinion Delivered** October 2, 2024 |
| JONATHAN[1] BALDWIN | APPELLANT | APPEAL FROM THE CLARK COUNTY CIRCUIT COURT [NO. 10DR-22-32] |
| V. | | |
| | | HONORABLE BLAKE BATSON, JUDGE |
| SHASTA BALDWIN | APPELLEE | REVERSED AND REMANDED |

**KENNETH S. HIXSON, Judge**

Appellant Jonathan[1] Baldwin (Jonathan) appeals after the Clark County Circuit Court filed a divorce decree in favor of appellee Shasta Baldwin (now Bolin) (Shasta). On appeal, Jonathan argues that the circuit court erred in awarding Shasta half of the insurance proceeds for which she had no insurable interest. We reverse and remand for the circuit court to reconsider the division of the insurance proceeds consistent with this opinion.

## I. *Relevant Facts*

Shasta and Jonathan were not married when Shasta and her children moved into Jonathan's house (the "house") in Glenwood, Arkansas, in late 2017. Approximately two years later while residing in Jonathan's house, on September 17, 2019, Shasta procured a

---

[1]We note that there are several spellings of appellant's first name throughout our record, including Jonathan, Johnathon, and Johnathan. We use Jonathan as it was the version used in his counterclaim and notice of appeal that was filed in circuit court.

homeowner's policy from Foremost Insurance Company, and Shasta paid the one-year premium. A week later, on September 24, 2019, Shasta and Jonathan took out a loan in the amount of $8,590.45 from Diamond Bank, and Jonathan pledged the Glenwood house as collateral for the loan. Also, Jonathan was added as a named insured on the Foremost homeowner's policy. Jonathan and Shasta were married on November 22, 2020.

Approximately two years later, on January 6, 2021, the parties separated, and Shasta and her children moved out of the house. Another year later, while the parties were still married but separated, on February 11, 2022, the house burned down. On February 17, 2022, Foremost Insurance issued a draft to Diamond Bank in the amount of $7,994.42 to satisfy the bank loan, leaving a balance of the insurance proceeds in the amount of $34,109.53.[2]

While the division of the balance of the insurance proceeds on the house was still pending, on March 18, 2022, Shasta filed her complaint for divorce, and Jonathan filed a timely answer. Subsequently, on August 11, 2022, Jonathan filed a counterclaim for divorce and a motion to compel. In Jonathan's brief attached to his motion to compel, he raised the issue of whether Shasta was entitled to any of the remaining insurance proceeds from the house. Jonathan argued that Shasta was not entitled to any of the remaining insurance

---

[2]Foremost Insurance issued a draft in the full amount of the insurance proceeds, $42,103.95, and included Diamond Bank, Jonathan, and Shasta as the payees. That check was returned, and Foremost Insurance issued a replacement draft in the amount of $7,994.42 to Diamond Bank, leaving a balance of the insurance proceeds in the amount of $34,109.53.

proceeds because Shasta lacked an insurable interest under Arkansas Code Annotated section 23-79-104 (Repl. 2014) and lacked any claim to the house. Accordingly, Jonathan claimed that any remaining insurance proceeds should be his sole and separate property.

A final divorce hearing was held on August 16, 2022.[3] At the hearing, Shasta testified that she had moved into the house in July 2017 before the parties were married. She further testified that she moved out of the house on January 6, 2021, and obtained an order of protection against Jonathan on February 22, 2021. Shasta admitted that Jonathan owned the house before they were married; however, she claimed that she assisted in paying the utilities and that some of the utilities were in her name. She initially purchased insurance on the house on September 17, 2019, and testified that she paid the first year's insurance premium. The subsequent years' premiums were paid "through the [Diamond Bank] loan." Shasta explained that Jonathan's name was later added to the policy on September 24, 2019, because Jonathan owned the property.

Shasta also testified that she and Jonathan took out a loan for $8,590.45 on September 24, 2019, and Jonathan secured the loan by pledging the house as collateral. Shasta testified that she helped make payments on the loan until she was forced to move out of the house because Jonathan was physically abusing her. Accordingly, Shasta requested that the circuit court award her half of the $34,109.53 insurance proceeds.

---

[3]Although the circuit court heard testimony regarding other divorce issues at that hearing, that testimony is irrelevant to the resolution of appellant's point on appeal.

On cross-examination, Shasta admitted that Jonathan had acquired the property and house before they were married and that her name was never added to the deed. She further admitted that she had not paid all the utilities while she lived at the house and that there were unpaid balances when she moved out. Shasta explained that she and Jonathan both worked sporadically and that it was difficult for them to pay utilities. Shasta agreed that the insurance proceeds were paid for the "[v]alue of the property" after the house burned down and "that was [Jonathan's] property, and [Jonathan] owned the house and the property before he married [her]." However, on redirect, Shasta claimed she nevertheless had a "clear, economic interest" and a "substantial marital interest" in the house because she cleaned the house, provided some money to pay utilities, paid toward the loan that was taken out by Jonathan and her, and raised her children in the house before moving out because of Jonathan's abuse.

Jonathan testified that he had lived in the house off and on his whole life. His grandparents deeded his father a life estate in the property in 2009 with the remainder to Jonathan and his sister upon their father's death. Their father died in 2016, and his sister deeded her interest in the property to Jonathan on September 9, 2019, making him the sole owner. Jonathan testified that the utilities had been in Shasta's name, but she did not regularly pay them. He explained that Shasta had difficulty keeping a job and would occasionally "chip in" when she received child support. Jonathan denied that Shasta had ever made any payments on the note. Jonathan admitted he was "somewhat" physically abusive toward Shasta during their marriage, but he claimed that Shasta had hit and stabbed

4

him several times as well. He further admitted that he pleaded no contest to domestic battery and that Shasta had obtained a five-year order of protection against him after she moved out.

Susan Schoggin, Jonathan's mother, testified that Shasta had only briefly worked during the parties' marriage. Ms. Schoggin stated that she knew the utilities were in Shasta's name but that Jonathan was the party that worked and paid the bills.

At the conclusion of the hearing, Shasta argued that she was entitled to half of the insurance proceeds because she had an insurable interest as required under Arkansas Code Annotated section 23-79-104. She explained that she and her children had lived in the house, paid toward the utilities, and put her name on both the insurance and the note in order to allow Jonathan to keep the house. She further argued that she would have remained living in the house had Jonathan not been physically abusive.

In opposition, Jonathan argued that Shasta was not entitled to half of the insurance proceeds. He argued that Shasta did not have an insurable interest in the house and never had any ownership interest in his house. He further explained that to the extent she may have had any interest due to the loan that was taken out in both their names, that loan was already paid. Accordingly, Jonathan argued that Shasta did not have any interest in the remaining insurance proceeds.

The circuit court filed a divorce decree on August 19, 2022. Regarding the insurance proceeds, the circuit court ordered the following division:

> The parties are each named insured on a check from Farmers Insurance in the amount of $34,109.53 from claim number 7004115486-1, and the parties shall evenly split the proceeds with each party receiving the amount of $17,054.65. The parties

shall make arrangements for each to receive their respective portion of the proceeds within 10 days of the entry of this Decree.

This timely appeal followed.

## II. *Standard of Review*

On appeal, this court reviews divorce cases de novo on the record. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Moreover, we will not reverse a circuit court's finding of fact in a divorce case unless it is clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467.[4] We also give due deference to the circuit court's determination of the credibility of the witnesses and the weight to be given to their testimony. *Id.*

## III. *Insurable Interest*

This case involves the potential entanglement of Arkansas insurance law and domestic-relations law. Shasta argues that she is entitled to one-half of the insurance

---

[4]Appellant argues that whether Shasta had an insurable interest is a question of law that we are to review de novo and give no deference to the circuit court's decision. Appellant cites *NP191, LLC v. Branch*, 2023 Ark. App. 156, 662 S.W.3d 713, in support of his contention; however, that case is not persuasive. In that case, the issue on appeal involved whether the circuit court erred in granting summary judgment on the basis that the statute of limitations barred the action—not whether the circuit court erred in determining a party had an insurable interest after a trial. Accordingly, we apply the clearly erroneous standard of review to the circuit court's factual findings in this case. *See also Bunn v. Luthultz*, 70 Ark. App. 26, 13 S.W.3d 915 (2000) (applying a clearly erroneous standard of review in reviewing whether appellee had any interest in insurance proceeds).

proceeds because she was a named insured under the Foremost policy and, alternatively, because she acquired a marital interest in the nonmarital house during their marriage.

In order to recover benefits under an insurance policy, a person must have an insurable interest both "at the time of effectuation of the insurance *and* at the time of loss." Ark. Code Ann. § 23-79-104(a) (emphasis added). "'Insurable interest' . . . means any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment." Ark. Code Ann. § 23-79-104(b). "It is not inconsistent that two parties can have independent insurable interests in one piece of property." *Beatty v. USAA Cas. Ins. Co.*, 330 Ark. 354, 360, 954 S.W.2d 250, 253 (1997). Further, it is clear that having an insurable interest in property does not depend upon ownership. *See, e.g.*, *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000); *Beatty, supra*. Instead, the party must have some legal basis for the assertion of insurable interest, which may be based, for example on (1) factual expectation of damages, (2) property interests, (3) legal liability, and (4) contract right. *See Beatty, supra*.

In domestic-relations cases, we have acknowledged that all nonmarital property shall be returned to the party who owned it prior to the marriage unless the court shall make some other division as it deems equitable. *Wilson v. Wilson*, 2023 Ark. App. 155, 662 S.W.3d 273. That said, we have also held that a circuit court may find that "a nonowning spouse is entitled to some benefit of the nonmarital property by reason of marital funds having been used to pay off debts on the owning spouse's nonmarital property." *Fell v. Fell*, 2015 Ark. App. 590,

7

at 6, 473 S.W.3d 578, 581 (quoting *Box v. Box*, 312 Ark. 550, 554–55, 851 S.W.2d 437, 440 (1993)). Further, when a circuit court fails to consider a nonowning spouse's contributions, we have remanded for a circuit court to make specific findings as to what, *if any*, benefits a nonowning spouse should receive for his or her contributions. *See Wilson*, *supra*.

On appeal, the parties both agree that the insurance was effectuated on September 17, 2019,[5] and that the loss occurred on February 11, 2022, when the house burned down.[6] Jonathan argues on appeal that the circuit court erred in awarding Shasta half of the insurance proceeds for which she had no insurable interest when the insurance was effectuated *or* when the fire occurred. Shasta argues that she had an insurable interest both at the time of effectuation of the insurance (September 17, 2019) and at the time of loss (February 11, 2022) because she had lived in the house with her children, procured and contributed to the insurance payments, was named on and contributed toward the payment of the promissory note and utilities, and married Jonathan on November 22, 2019. She further explains that the parties continued to live in the house after their marriage and were

---

[5]We acknowledge that in one instance in Shasta's brief on appeal, she states, "When the insurance was effectuated on September 17, 2017, Shasta and [Jonathan] were two months away from their wedding date of November 22, 2019." Clearly, Shasta meant September 17, 2019—not 2017—given the context of the remainder of her sentence stating that the date of effectuation was two months in advance of their wedding. Further, Shasta testified at the divorce hearing that she first purchased the insurance on September 17, 2019, and repeated this statement at other points in her brief on appeal.

[6]Because the parties concede on appeal that these are the relevant dates at issue, we do not offer any opinion as to their accuracy or the distinction, if any, between the effectuated date and the effective date or renewal date as reflected on the insurance certificate.

subject to "domestic-relations laws" until she was forced to leave after Jonathan had physically abused her. Accordingly, she argues that she had a clear interest in the house and attempts to argue that she "had more interest in the house than did [Jonathan]."

However, instead of the circuit court analyzing the unique facts of this case and applying the insurance and domestic-relations standards as outlined above, the circuit court merely determined that "the parties shall evenly split the proceeds" because the "parties are each named insured on a check from Farmers Insurance in the amount of $34,109.53." That was erroneous. The circuit court did not make any factual findings as to whether Shasta had an insurable interest both at the time of effectuation of the policy and at the time of loss under Arkansas Code Annotated section 23-79-104(a) as the parties had argued. The circuit court also failed to make any specific factual findings as to what, *if any*, interest Shasta had acquired on the basis of her contributions to Jonathan's premarital house. Accordingly, we reverse and remand for the circuit court to reconsider the division of the insurance proceeds consistent with this opinion.

Reversed and remanded.

BARRETT and WOOD, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Vardaman Law Firm PLLC*, by: *Gregory L. Vardaman*, for appellee.